# In Re Contested Election of Hugh McNeill as Senator.

1. The Supreme Court does not have jurisdiction to review the judgments or decrees of the Court of Common Pleas in contested elections of Senators or Representatives.

2. The power conferred on the respective houses of the Legislature by Art. II., Sec. 9 of the Constitution of the state, viz.: that " each house shall judge of the election and qualification of its members," is not taken away by Art. VIII., Sec. 17, of the said Constitution, which provides that, " the trial and determination of contested elections . . . . . of all public officers . . . . . shall be by the courts of law, or by one or more of the law judges thereof." The purpose of this section is merely to provide a method for procuring and presenting to the respective house the evidence necessary for an intelligent decision, and to secure early action.

3. The Act of 19th May, 1874, provides a complete method for speedily determining which candidate received the greatest number of legal

votes and is entitled to the certificate of election, but it does not author-
ize the court to enter any judgments or make any decree declaring
which claimant is entitled to the office.

4. One aggrieved by the decision of the court in his case must present
his petition to the proper house. If the correctness of the findings of
the court be questioned, the whole case is sent to the proper committee
for hearing, which is not restrained as to what evidence it shall hear
and consider, nor from what source it shall be obtained; the commit-
tee then reports " for the consideration of the house." ·

November 9th, 1885. Before MERCUR, C. J., GORDON,
PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

CERTIORARI to the Court of Common Pleas No. 1, of *Al-
legheny county:* Of October and November Term, 1885, No.
221.

In 1882 Hugh McNeill and Morrison Foster were candi-
dates for senator in the Forty-second senatorial district. Mc-
Neill was returned as having a majority of 31 votes. On
December 16th, 1882, certain voters in the district filed a
petition contesting the election. Among other grounds of
contest it was alleged that in certain districts of the First,
Third and Fourth wards, of Allegheny, the election had been
held outside of the geographical limits of the district. A
motion to quash the petition as to these allegations was made,
and overruled by the court. A commissioner was appointed,
and after more than two years of taking testimony the case
was certified to court, and upon agreement every allegation of
fraudulent voting was abandoned, and the contest was placed
upon the election being held outside of the election districts
in certain precincts of the First, Third and Fourth wards be-
fore alluded to. The court by its decree rejected from the
count all votes cast in these precincts, filing the following
opinion :

This record raises two questions : 1. Was a legal election
held in the following districts of the city of Allegheny : No.
1 of the First ward, No. 3 of the Second ward, and Nos. 1
and 3· of the Fourth ward; and 2. Was a legal election held
in Kilbuck township.

It appears that the Court of Quarter Sessions divided the
above wards of the city of Allegheny into election districts
and appointed the election officers for the new districts, but
by the neglect of the petitioners the court did not " fix the
places for holding the elections." The evidence does not dis-
close how these places were selected, but we have been told
that they were designated by the city councils. The places
indicated for the four districts above were not within the
boundaries of the respective districts, but were in certain

rooms of the public school building in adjoining districts of the same wards.

Though the selection of a place for holding elections beyond the limits of the district is in disregard of the principal object for which townships, wards, etc., are divided into election districts, the real questions involved are whether it is lawful to hold an election at a place "outside of the district," and whether votes cast at such a place are legal. These questions are conclusively answered by the language of the state constitution. That instrument provides that "every male citizen twenty-one years of age, possessing the following qualifications, shall be entitled to vote," and necessarily any citizen not possessing each and all of the prescribed qualifications shall not be entitled to vote. The third of these essential qualifications contains the answer to the above questions. It says, " he (the elector) shall have resided in the election district *where he shall offer to vote* at least two months immediately preceding the election." The elector, to possess this qualification, must reside and offer to vote in one and the same district. He who resides for two months before an election in one district, and offers to vote and votes in another, cast an unauthorized ballot.

Did this language of the Constitution need interpretation to make its meaning clear, it has authoritatively received it, and that interpretation has been acquiesced in, and for over twenty years. This qualification was adopted from the former Constitution, the time of the prescribed residence being increased from ten days to two months. The similar provision of the former Constitution has been passed upon by the Supreme Court, in Chase *v.* Miller, 5 Wright, 419. The court say of this provision, which was an amendment of the prior Constitution, " construing the words according to their plain and literal import (and we must presume that the people of Pennsylvania construed them so when they adopted the amendment), they mean undoubtedly that the citizen possessing the other requisite qualification is to have a ten days' residence in an election district, and is to offer his ballot in that district. . . . . . The amendment introduced not only a new test of the right of suffrage, to wit, a district residence, but a rule of voting also. Place became an element of suffrage for a two-fold purpose. Without the district residence no man shall vote, but having had the district residence the right it confers is to vote in that district. Such is the voice of the Constitution. The test and the rule are equally obligatory. We have no power to dispense with either. Whoever would claim the franchise which the Constitution grants must exercise it in the manner the Constitution prescribes."

[In Re Contested Election of McNeill.]

Again, the legislature by resolution of 26th April, 1844, undertook to amend the former Constitution, and to authorize a citizen, who had removed from his district to another within ten days before an election, to vote in the district from which he had removed, thus attempting to permit an elector to vote in a district in which he did not reside.   This resolution came before the Court of Common Pleas of Philadelphia, in Thompson *v.* Ewing, 1 Brewster 103, and the court, upon the authority of Chase *v.* Miller, ruled that the resolution was unconstitutional.   So satisfactory and convincing were these decisions that the resolution of 1844 has been omitted in Purdon's Digest of the laws of the state.

The introduction into the present Constitution of language, with a known interpretation, is an authoritative adoption of that interpretation, and puts an end to controversy.

The legislature, immediately after the adoption of the Constitutional amendment above referred to, gave it the construction reached by the courts.   They enacted that the election officers " shall meet at the respective places appointed for holding the election in (not for) the district to which they respectively belong," etc. (1 Purdon 544, pl. 17), and that it shall be an offence if an elector " shall vote out of his proper district ":   Purdon 367, pl. 274.

We are, therefore, reluctantly compelled to reject from the count in this matter all the votes cast in these four districts. This result will not be without compensation if it will admonish the citizen that he must read and conform to the Constitution and laws, and that he must not expect that the courts shall, by judicial glosses and refinements foreign to the plain words of the law, protect him from the consequences of his own indifference and inattention.

As the result of this contest would not be affected by it, it is not necessary that we should pass upon the question in the matter of Kilbuck township, where the election officers, from considerations of comfort or health removed from the prescribed polling place and held the election in an adjacent building.   We may say, by way of caution, that no Act of Assembly confers upon the election officers the right to hold an election at any place but that designated, and that the law provides ample and speedy remedy whenever a reasonable occasion arises.   In the present case many of the citizens and some of the election officers knew that the polling place would be uncomfortable, in ample time to have made it suitable at a trifling expense.   Under such circumstances the question involved here should not have been permitted to arise.

The returns show that in the election held in November, 1882, for the office of senator for the Forty-second senatorial

district, Hugh McNeill received 3786 votes, and that Morrison
Foster received 3755 votes, and that the other candidates
received a less number of votes.  It also appears that in the
said election districts of Allegheny City, Hugh McNeill
received 518 votes, and that in the same districts Morrison
Foster received 370 votes.  Deducting these from the num-
ber returned for the respective candidates for senator, we find
that Morrison Foster received 3385 votes, and that Hugh
McNeill received 3268 votes, showing an excess in favor of
the former of 117 votes.

We therefore decide that Morrison Foster received the
greatest number of legal votes cast at said election for the
office of senator of the Forty-second senatorial district, and
that he is entitled to the certificate of election to said office.

· It is ordered, that the costs of this proceeding be paid by
the county.  Let a decree be drawn in accordance with this
opinion.

The following decree was accordingly entered :

"And now, October 22d, 1885, this cause came on to be
heard on the record and proceedings and testimony taken, and
was argued by counsel; whereupon it is ordered, adjudged
and decreed, in accordance with the opinion of the court,
heretofore filed, that Morrison Foster received the greatest
number of legal votes cast at the election for senator in the
Forty-second senatorial district held on November 7th, 1882,
and that he is entitled to the certificate of election to the
office of senator from said district by reason of such election,
and the court having ascertained that there was probable cause
for the contest, it is ordered that the costs be paid by the
county of Allegheny."

To this McNeill excepted and took this writ of certiorari,
assigning for error the entering of this decree.

· *W. B. Rodgers* (with whom was *F. M. Magee*), for the
plaintiff in the certiorari.—I. Although the Act of Assembly
in relation to cases of contested elections in terms allows no
appeal, we are entitled to have the judgment and decree of
the court below in this cause reviewed here on certiorari:
Ewing *v.* Thompson, 7 Wright 372 ; O'Neill's case, 2 Out.
461 ; In re Germantown Avenue, 3 Id. 479.

II. The votes of the qualified voters expressed at the time
and place, and in the manner prescribed by law, is conclusive
of the right to an elective office.  It is the aim of courts to
give effect to the popular will, as expressed at an election ; not
to thwart it by technicalities.  There is no power in the Court
of Quarter Sessions to fix polling places in the city of Alle-
gheny ; that power is vested in councils, (see Act of March

31st, 1870, sec. 22, P. L. 721.)    There was no evidence that the court had not fixed these polling places.. Until that question was raised we had the right to depend on the presumption that all things were done right.

*R. B. Parkinson* (with whom was *C. F. McKenna*), for the defendants in the .certiorari.—We do not contend that the record in contested election cases may not be reviewed by the Supreme Court, but we do contend that contests relating to the seats of senators or of members of the House of .Representatives cannot be reviewed either upon matters raised by the record, nor at all by this court.    We submit that sections 11, 12, 13, 14 and 15 of the Act of 19th May, 1874, P. L. 211, 212 (Purdon's Digest, p. 1871, §§ 71 to 75 inclusive), provide a complete mode of procedure, and that after the Court of Common Pleas shall have decided which of the candidates voted for received the greatest number of legal votes, and is entitled to the certificate of election, the duties of the courts of law end; and that further proceedings in the way of appeal or review, both of matter of law and fact, must be under the 15th section of that Act, " providing that any claimant to a seat in either branch of the legislature who shall feel aggrieved by the decision of the court in his case may present his petition to the proper house."

Chief Justice MERCUR delivered the opinion of the court, January 4th, 1886.

The Constitution of Pennsylvania in force before that of 1874 went into effect, declared, " Each house shall judge of the qualification of its members."    It further provided that contested elections should be determined by a committee to be selected, formed and regulated in such a manner as should be regulated by law.

Art. II., sec. 9, of the Constitution of 1874 declares, "Each house shall judge of the election and qualification of its members."

Art. VIII., sec. 17, provides that the trial and determination of contested elections of members of the General Assembly, and other officers therein named, shall be by the courts of law, or by one or more of the law judges thereof, and that the General Assembly should by general law designate the courts and judges by whom the several classes of election contests shall be tried, and regulate the manner of trial and all matters incident thereto.

A careful reading of this sec. 17 shows that its purpose is not to take from each house the power to judge of the election and qualifications of its members, given by sec. 9 cited.

[In Re Contested Election of McNeill.]

Its purpose is merely to provide a method for procuring and presenting to the respective house the evidence and information necessary for an intelligent decision, and to secure early action.

It will be observed that the earlier Constitution authorized each house to judge of the "qualifications" of its members. The present Constitution changes the language, and authorizes it to judge of "the election and qualifications" of its members. While the addition of the word "election" may not give to the house any power which it might not have exercised under authority to judge of the "qualifications" of its members, it clearly shows an intention not to restrict the legislative power.

In furtherance of the view we have expressed, and to give due effect to both provisions of the Constitution cited, the Act of 19th May, 1874, was passed. Sec. 11 thereof provides that contested elections of senators and members of the House of Representatives shall be tried and determined by the Court of Common Pleas of the county where the person returned as such shall reside. Sec. 12 prescribes the time and the manner in which proceedings shall be commenced for contesting the election. Sec. 13 authorizes the court to compel the attendance of witnesses, and the production of all written, printed and documentary evidence required at the hearing. Sec. 14 declares that, after the hearing, the court shall, without unnecessary delay, decide which of the candidates voted for received the greatest number of legal votes, and is entitled to the certificate of election.

After the reception of the certificate by the proper house, sec. 15 provides the form and manner in which any claimant to a seat therein, who is aggrieved by the decision of the court in his case, may present his petition to said house. It further provides that the petition shall be referred to the standing committee on elections, which shall proceed to hear the claims of the contestant and the respondent, and report the facts and a resolution expressing the decision of the committee "for the consideration of the house, and the vote of the proper house on the claims of the contestant and respondent shall be final."

This Act does not authorize the Common Pleas to enter any judgment or make any decree declaring which claimant is entitled to the office, but merely that it shall decide which candidate received the greatest number of legal votes and is entitled to the certificate of election. This language appears to have been purposely used so as not to impinge on the power of the respective house to ultimately judge and determine. The same Act provides for the trial before the courts

1 AMERMAN—16

of contested elections of divers other officers, and declares that the person who by the decision of the court shall appear to have received the largest number of votes " shall be entitled to the office," and be commissioned accordingly.   In contested elections of senators and members the Act does not give any such power to the court, nor any such effect to its decision.

Neither the facts found by the court, nor its opinion as to who is entitled to the certificate of election, are to control the judgment of the respective house.   The legal effect thereof on the house is no greater than the report of one of its own committees.   If the correctness of the finding be questioned, the house sends the whole case to its standing committee on elections, which must hear the claims of the contestant and respondent, and report the facts as it finds them to be, and a resolution expressing the decision of the committee.   The Act imposes no restriction on the committee as to what evidence it shall hear and consider, nor from what source it shall be obtained.   Whatever it reports is only " for the consideration of the house."

Every fact and every conclusion of law found by the court and by the committee may be disregarded by the house, and its decision, expressed by its vote, as to which is entitled to the office, is final and conclusive.

There is nothing in the Act of 1874 indicating that the legislature intended to authorize the correctness of the conclusion at which the Common Pleas arrived as to senators and members to be reviewed on certiorari by a superior court.   On the contrary, the whole scope and purpose of the Act negatives such idea.   Were we to assume jurisdiction to review this advisory action of the Common Pleas, whether we agreed or disagreed with it, our conclusion would be of no binding obligation on the house.   Any presumption that the legislature intended to impose so useless a duty on this court cannot for one moment be entertained.   Nothing less than clear and specific authority would justify us in taking jurisdiction to review the action of the Common Pleas in this class of cases. Such authority is neither expressed nor implied.

Writ of certiorari quashed.