Harrington, Appellant, *v.* Carroll.

Argued January 3, 1968. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Edward R. Becker,* with him *Herbert W. Salus, Jr.,
Larrick B. Stapleton, Oscar N. Gaskins,* and *Becker &
Becker,* for appellant.

*Levy Anderson,* First Deputy City Solicitor, with
him *Edward G. Bauer, Jr.,* City Solicitor, for appellees.

*David Berger,* with him *Cohen, Shapiro, Berger,
Polisher and Cohen,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 14, 1968:
Section 2-103 of the Philadelphia Home Rule Char-
ter states: "QUALIFICATIONS OF COUNCILMEN. A coun-
cilman shall be a citizen of the United States, shall
have been a resident of the City for at least one year
prior to his election, and shall be at least twenty-five
years of age when elected to office. District coun-
cilmen shall be, and during their terms of office shall
remain, residents of the districts from which they were
elected. The Council shall be the sole judge of the
qualifications of its members."
It is one of the striking phenomena of the legal
world how there could be controversy over so simple
a declaration. But the appellants in this case do ques-

tion and do controvert the quoted utterance. They argue that it does not mean what it says, but even only a one-eyed glance at the paragraph should reveal that the proposition therein contained is expressed in language as limpid as a running brook, as apparent as a mountain by the sea, and as easily read as if it were spelled out in children's kindergarten blocks.

The Philadelphia Home Rule Charter is the law of Philadelphia; it is the Magna Charta of this illustrious city. It was adopted by the people in a solemn referendum, after the procedure had been authorized and mandated by the General Assembly of Pennsylvania under the aegis of the Constitution of the Commonwealth. So far as the government of Philadelphia is concerned, the Philadelphia Charter is inflexible law. Justice CHARLES ALVIN JONES, later Chief Justice, declared in the *Addison Case,* 385 Pa. 48, 57, that the Philadelphia Home Rule Charter "emanated from the relevant provision of the State Constitution, implemented for appropriate execution by the enabling Act of 1949, and was duly adopted (i.e., enacted) by the affirmative vote of the electors of the City as the organic law of the corporate municipal body. That the Charter constituted legislation no less than does a statute of the legislature to like end is too plain for even cavil. Whether a municipal charter comes into being by direct statutory grant of the legislature or by adoption by the constituent electorate in the exercise of power constitutionally reposed, it is as much legislative in the one instance as in the other and has equal legal force and standing in both. Indeed, a constitutionally permissible adoption of a municipal charter by the electorate is not one whit less in dignity than a statute of the legislature granting a charter. Where it is adopted by a constitutionally empowered electorate, it affords an example of pure democracy—the sovereign people legislating directly and not by representatives

in respect of the organization and administration of their local government. . . Wherefore, upon its due adoption, Philadelphia's Home Rule Charter took on the force and status of a legislative enactment."

In *Lurie v. Republican Alliance,* 412 Pa. 61, 63, this Court said: "Where a remedy is provided by an act of assembly, the directions of the legislation must be strictly pursued and such remedy is exclusive," citing authorities.

John B. Kelly was a candidate for the office of councilman-at-large of City Council of Philadelphia in the primary and general elections of 1967. He was nominated in accordance with election law, and, in November, 1967, was elected with 356,694 votes, the second highest number of votes cast for any candidate for the office of councilman-at-large. The Return Board of Philadelphia County, after a computation, whose mathematical accuracy no one questions, was prepared to certify Kelly's election, when the plaintiffs in this case, Clark J. Harrington, as a taxpayer and elector of Philadelphia on behalf of all other taxpayers and electors of the City (by virtue of an amendment to his complaint), and by the Republican City Committee on behalf of its unsuccessful candidate, George Woods, filed a complaint in equity in the Court of Common Pleas of Philadelphia County, against the six judges of the Court of Common Pleas of Philadelphia County who acted as an Election Return Board, certain fiscal officers of the city, the other sixteen councilmen-elect, and John B. Kelly, Jr., requesting that the Return Board be enjoined from certifying Kelly's election, that no funds be paid him in connection with the assumption of office by him, that the other councilmen-elect be enjoined from seating Kelly, and that Kelly be enjoined from taking office as a councilman.

The plaintiffs further prayed that the court by mandatory injunction order the Return Board to certify the election of George Woods on the averment he received the highest number of votes of the unsuccessful candidates for councilman-at-large, or, that in the alternative, the court direct the incoming President of City Council to call a special election to fill the vacancy if Kelly is declared ineligible for office.

The defendants filed preliminary objections to the complaint. The objections were sustained by the court below and this appeal followed.

It is the contention of the plaintiffs that John B. Kelly did not live in Philadelphia when elected, but, on the contrary, resided in Wynnewood, in Montgomery County. If this be true, he may not, under the Charter, be seated as a councilman-at-large. But who determines whether he is qualified? The Council itself. This is spelled out in the Charter and in the very section which prescribes and defines the qualifications. But, the appellants argue, the Council does not have exclusive jurisdiction over qualifications, and advance the case of *Commonwealth v. Allen*, 70 Pa. 465, in support of their position. But it would take a heavily-pressed shoehorn to fit the *Allen* case into the shoe of this case, and, at best, only a limping conclusion could be achieved.

In the *Allen* case, two councilmen of Philadelphia were allegedly disqualified from holding office because they were sureties for the city treasurer, in violation of an Act of Assembly. This Court held that, because of this infraction of law, the men had to forfeit their office. The defendants in that case argued that the courts had no jurisdiction over the qualifications of city councilmen because they, like assemblymen, could only be denied office on a vote of their fellow-legislators, that is, their fellow-councilmen. This Court faced that argument and replied that here it was not a ques-

tion of qualification for office but of forfeiture: ". . . It is said that councils have power in like manner as each branch of the legislature to judge and determine the qualification of their members. Granting that, it does not follow that the authority of the court is taken away to inquire into a forfeiture, which does not take place until the member has been admitted to his seat. . . *The error is in confounding disqualification with forfeiture, so far as to suppose they are equivalent expressions.* The fact that a man is a surety for a corporation officer is a cause of disqualification to take the seat, but when the seat is taken it becomes a cause of forfeiture." (Emphasis supplied).

The appellants' brief, praiseworthy in its historical references, takes the reader back to the days of the Tudors and Stuarts, monarchs of England, who usurped power to determine the qualifications of members of Parliament. The people of England wrested from those despots that authority and placed it in the hands of the House of Commons. The appellants then show how the original American colonies wrote into their respective constitutions the fundamental prerogative, as well as duty, of the legislators to pass on the qualifications of its members and how this elementary proposition of trustworthy government is now written into the Constitution of the United States and, of course, the present Constitution of Pennsylvania. Then, in an astonishing non sequitur, the appellants say that the city legislature, that is, the City Council of Philadelphia, does not have the sole power to pass on qualifications of its members. This argument defies practically every jurisprudential pronouncement on the subject. The principle is succinctly stated in 18 Am. Jur., §288: "A constitutional provision that each house of the legislature shall be the judge of the election and qualifications of its own members is an exclusive grant of power and constitutes each house the sole and ulti-

mate tribunal to pass upon the qualifications of its own members, which power cannot be granted away or transferred to any other tribunal or officer."

After citing *Commonwealth v. Allen* (decided before the 1874 Constitution), the appellants refer to some other old cases. A precedent hoary with age is not for that reason unauthoritative, especially when the principle therein asserted has been reaffirmed over the passing years. But when the old oaken bucket is replaced by a modern drinking fountain which responds to a pedal push, and quenches the thirst of the drinker instantly and wholesomely, one does not insist on creaking a crank to bring to the surface the moss-covered bucket of yore.

The cases which were decided prior to the case of *Auchenbach v. Seibert,* 120 Pa. 159 cannot prevail over that decision which was based on a set of facts almost identical to those present in the case at bar. Daniel Auchenbach stood for election to the Select Council in the second ward of Reading, received the largest number of votes, and was declared elected as a member of the Select Council of Reading. A number of citizens and qualified electors in the second ward petitioned the Court of Quarter Sessions of Berks County to declare Auchenbach's election illegal because, the petition asserted, Auchenbach did not live in the second ward and, therefore, was not qualified to take his seat as councilman. The court of quarter sessions assumed jurisdiction over the controversy, heard testimony and decided that Auchenbach did not live in the second ward. It then proceeded to disqualify him from the office to which he had been elected. Judge ERMENTROUT, who wrote the opinion for the court of quarter sessions, argued in the same manner as do the appellants in the case before us. He said: "Our jurisdiction of this case is questioned. It is asserted that, although the law rigidly demands that a candidate for office

shall have certain prescribed qualifications, the election of such candidate cannot be contested for the want of such qualifications; that the election of a person disqualified does not make the election either 'undue or illegal,' and that in a contested election the courts are simply to determine whether the machinery of holding the election has been put in proper motion, the election held at the proper time and place and in the manner and by the proper persons as required by law, without fraud or mistake, and a correct return thereof made; that in the present case, because §4 of the municipal act of May 24, 1887, P. L. 204, says: 'Each branch of councils shall judge of the qualifications of its members, and contested elections shall be determined by the courts of law,' the question of 'qualifications' belongs exclusively to councils to determine." Judge Ermentrout said that this was all wrong, that the courts did have jurisdiction to pass on the qualifications of members of council, and he came to the conclusion: "And now having heard the case, and having tried and determined the controversy, we find that Daniel Auchenbach was not an inhabitant for one year of the Second ward, city of Reading, before his alleged election as member of select council from said ward, and adjudge that he was and is disqualified under the law from holding such office, and that his alleged election is undue and illegal."

Auchenbach appealed to this Court, which flatly overruled Ermentrout, and, speaking through Chief Justice Gordon, cogently declared: "It is very clear that the Court of Quarter Sessions acted ultra vires in entering judgment of ouster against the respondent. It had no jurisdiction to pronounce upon the qualification of Daniel Auchenbach as a councilman. *The act of assembly vests that power not in the court, but in that branch of the municipal council to which the member may be elected.* It is only in contested election

cases that the court has jurisdiction, and *as this juris-diction is not one of common law it cannot be extend-ed by implication beyond the prescriptions of the act in which it originates.* Were the question before us, we might take issue with the court below on the fact of the respondent's qualification, but, as what we have said fully disposes of the case in hand, we need not pass upon an issue which is foreign to the pending con-troversy." (Emphasis supplied).

Echoing the language of Chief Justice GORDON, we would say here that the physical residence of John B. Kelly is foreign to the litigation currently in this Court. The issue of his residence is, according to legislative mandate, a matter for the City Council of Philadel-phia to determine. Section 2-103 of the Charter, we repeat, proclaims: "THE COUNCIL SHALL BE THE SOLE JUDGE OF THE QUALIFICATIONS OF ITS MEMBERS."

To say, in the face of that explicit phraseology that the qualifications of council members may be deter-mined by another tribunal is equivalent to saying that *hot* may mean *cold,* that *up* may signify *down,* and that *full* can be interpreted as *empty.* For a court to affix its imprimatur to such distortion of language would be to send the law adrift on a Sargasso Sea of lexi-cographical pandemonium.

The appellants cite the case of *Commonwealth ex rel. v. Bennett,* 233 Pa. 286, in support of their posi-tion but they do so in vain because there, as in the *Allen* case, the question was one of forfeiture of office, not disqualification for office.

Then the appellants summon to their cause the re-cent case of *Bond v. Floyd,* 385 U.S. 116, 129, where the Supreme Court of the United States reviewed the action of the Georgia Legislature which twice refused to seat Julian Bond although he had received enough votes for election. One can never determine the contents of a house from the outside, by a rapid look through a

window. In that case Julian Bond, in the exercise of free speech guaranteed in the First Amendment to the Constitution of the United States, criticized the foreign policy of the United States with reference to Vietnam, and made derogatory remarks on the operation of the Selective Service Laws. The Supreme Court declared that to exclude Bond from his legislative seat would be to penalize him for exercising the prerogatives of a United States citizen. It must be perceived by even half a glance through constitutional windows that the decision of the Supreme Court in the Bond case can have no application to the Kelly case where no constitutional question is involved and where the only issue to be decided is the residence of Kelly, which, let it be reiterated, is strictly and solely a matter for determination by City Council, as edicted by the City Charter.

The appellants do not, and cannot, insist that the *Bond* case is controlling here, so they limit themselves to arguing that it "establishes a new trend in the law." But the law is not a fashion garment to be tailored, shortened or lengthened according to trend, fancy or whimsy.

The appellants concede "that the overwhelming authority as respects State legislatures is that the Courts have no jurisdiction to determine qualifications," but they then go on to say that "nonetheless it is apparent that the Bond case is signaling the beginning of the end of this impregnable wall."

To argue that the right of the legislatures to determine the qualifications of its members is a wall which should be shattered is to maintain that representative government is on the way toward its own demolition. It is to prevent any such catastrophe that the United States and Pennsylvania Constitutions provide for courts, judges and law. And it is our duty, within the framework of those constitutions, to defend that wall

by upholding the sanctity of the system of constitutional separation of powers.

Our decision that the City Council of Philadelphia has exclusive jurisdiction to determine the qualifications of its members, including, of course, the subject of this litigation, John B. Kelly, makes it unnecessary to discuss the other matters raised in the complaint and argued in the appeal.

Order affirmed with costs on the appellants.

---

CONCURRING OPINION BY MR. JUSTICE JONES:

In resolving the controversy raised upon this appeal, it is my position that, in the present state of the law, the *jurisdiction* and *competency* of a court of law to pass upon the qualification of a person to seek nomination and election and, if elected, to be seated as a member of the City Council of Philadelphia depends upon *when* (i.e., whether in the pre or post-election period) and *how* (i.e., attacks on the regularity of the nomination petitions, validity of the election, etc.) the issue of qualification is raised.

If the qualification of a person *to be a candidate* for the office of City Council of Philadelphia is challenged upon the ground that such person is not qualified, by reason of lack of citizenship, residence in the City, or age, then a court of common pleas has jurisdiction to entertain such controversy, provided, of course, that the court's jurisdiction is invoked within the statutorily mandated period of time. The court of common pleas has such jurisdiction solely because the General Assembly of the Commonwealth, by statute, has seen fit to invest the court with this jurisdiction. (See: Pennsylvania Election Code of 1937, §977 (Act of June 3, 1937, P. L. 1333, §977, as amended, 25 P.S. §2937)) and the statutory remedy so provided is exclusive: *Lurie v. Republican Alliance,* 412 Pa. 61, 63, 192 A. 2d 367 (1963).

As a matter of fact, an attack was made upon the qualification of Mr. Kelly, allegedly a nonresident of the City of Philadelphia,[1] to seek the office of a city councilman of Philadelphia. The Court of Common Pleas of Philadelphia County dismissed that action because the attack had not been *timely* made under the provisions of the statute and we quashed an appeal from the order of that court. (See: *Jaspan v. Osser,* S. Ct. Eastern District, No. 393 January Term, 1967; also concurring opinion of Mr. Justice ROBERTS, *Chalfin v. Specter,* 426 Pa. 464, 233 A. 2d 562 (1967)). Had this attack upon Mr. Kelly's qualification as a candidate for city council been *timely* made, the court of common pleas would have had the statutorily granted jurisdiction to pass upon the issue and Mr. Kelly's qualification, or lack thereof, could have been established prior to the time of his nomination and election.

The present challenge to Mr. Kelly's qualification arose after the election had been held and after Mr. Kelly had been elected as a city councilman. In my view, the *only* tribunal which has the authority under such circumstances to determine the qualification of Mr. Kelly to take his seat as a member of the City Council and to pass upon his residence qualification is the City Council of the City of Philadelphia.

The Home Rule Charter of the City of Philadelphia vests the *exclusive* competency to determine Mr. Kelly's qualification in the legislative body of the City. Section 2-103 of the Charter requires, inter alia, that a "Councilman . . . shall have been a resident of the City for at least one year prior to his election" and further states: "The Council shall be the *sole* judge of the qualifications of its members." (Emphasis added)

---

[1] In the posture of the instant appeal, we must *assume* from the pleadings that Mr. Kelly is not a resident of the City.

The language of the Charter is clear and unequivocal and exclusively makes the City Council the tribunal to determine a prospective member's qualifications.

This Charter declaration is not novel.[2] The vesting of authority to pass upon the qualifications of prospective legislators in the legislative body is deemed an essential concomitant of our tripartite form of government affording to the legislative branch an independence requisite to its successful functioning.

*Bond v. Floyd,* 385 U.S. 116, 87 S. Ct. 339 (1966), upon which a minority of this Court rely, while it does create an exception to the generally accepted rule, furnishes no justification for our assumption of jurisdiction to pass upon Mr. Kelly's qualification. *Bond* dealt with the action of a state legislature which disqualified a prospective member of that legislative body because of certain statements made by such respective member which the legislative body considered treasonable in nature. The United States Supreme Court, deciding that, under the Constitution of the United States, the statements allegedly made by the prospective legislator fell within the ambit of the constitutionally protected right of free speech, held that the judiciary may assume jurisdiction of a controversy involving the qualifications of a person to be a member of the legislative body if the effect of a disqualification on the grounds stated would constitute an infringement of a constitutionally protected right. In our case, there is neither an allegation nor a showing of any infringement or threatened infringement of a constitutionally protected right; the ruling in *Bond* is clearly inapposite.

In taking the position that this Court lacks jurisdiction to pass upon the qualifications of the *elected*

---

[2] Cf.: Constitution of Pennsylvania, Art. 2, §9.

Mr. Kelly, I believe such position is supported not only by the clear language of the Charter, but also by our case law. *Auchenbach v. Seibert,* 120 Pa. 159, 13 A. 558 (1888) controls the disposition of this controversy. The teaching of *Auchenbach* is that, other than in contested election cases,[3] courts do not have jurisdiction to pass upon the qualifications of an elected person to serve as a member of a legislative body.

Some members of this Court who believe that this Court does have jurisdiction to pass upon Mr. Kelly's qualification rely upon *Commonwealth v. Allen,* 70 Pa. 465 (1872), *Commonwealth ex rel. v. Bennett,* 233 Pa. 286, 82 A. 249 (1912) and *Lesker Case,* 377 Pa. 411, 105 A. 2d 376 (1954). My study of these decisions convinces me that these decisions are inapplicable to the instant situation. The position of the majority, in which I join, does not diminish the effect of these decisions. *Allen* and *Bennett* involved questions of forfeiture of, not qualification for, public office and to suggest that *Allen* and *Bennett* are apposite to the case at bar, I respectfully submit, is to confuse forfeiture of with qualification for public office. *Lesker* involved a determination of the right of a person, allegedly lacking residential qualifications, to be a candidate for the legislature, the proceeding was under the Election Code, supra, and the court clearly had jurisdiction to pass upon the validity of Lesker's nomination petition. Absent any allegation or showing of a violation of a constitutionally protected right (*Bond*) and of any contest as to the regularity or validity of Mr. Kelly's *election,* the instant controversy is nonjusticiable (*Powell v. McCormack,* 266 F. Supp. 354, 35 L.W.

---

[3] Art. 8, §17, which vests the judiciary with power to hear and decide contested election cases, does not take away the authority of the legislature to judge the qualifications of its members under Article 2, §9. See: *In re Contested Election of McNeill,* 111 Pa. 235, 2 A. 341 (1885).

2594, 4/7/67) and is a controversy for the determination of which this Court lacks jurisdiction.

The Charter of the City of Philadelphia declares that *only* the City Council has the right to pass upon the qualifications of a person duly elected to be admitted to the membership of City Council. Neither at common law, under our case law nor under any statutory authority has our Court any *jurisdiction* or *competency* to pass upon and determine the qualifications of one who has been elected to membership in the legislative body of the City of Philadelphia. I, therefore, join in the result reached by the majority of this Court and I would affirm the order of the court below.

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the judgment reached by the majority but wish to add, in view of Justice ROBERTS' concurring opinion, that the very court that created the *Allen* rule refused to apply the rule in *Commonwealth ex rel. Needles v. Henszey,* 81* Pa. 101 (1873), holding that an "undue election" of a member is to be determined by the councils and not by *quo warranto.* It said: "The defect if one, was known at and before the election, and an immediate trial might then have been had. The Commonwealth v. Allen et al., which was a case of forfeiture, has no application to the case before us. This was the specific remedy and *quo warranto* did not lie."

If I were to find fault with or criticize the *Allen* rule, it would be because the court exercised its jurisdiction in a forfeiture case where the charter similarly provided "That council shall be the sole judge of the qualifications of its members."

CONCURRING OPINION BY MR. JUSTICE O'BRIEN:

I concur in the result reached by the majority. I do so, however, on the exclusive ground that, like Jus-

tice ROBERTS, I continue to adhere to the position stated by him in his concurring opinion in *Chalfin v. Specter,* 426 Pa. 464, 477, 233 A. 2d 562, 568 (1967), in which concurring opinion I joined.

Since I conclude that appellant did not pursue the exclusive statutory remedy available to him, I have no reason to speculate on the question of whether §2-103 of the Philadelphia Home Rule Charter precludes judicial intervention.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I continue to adhere to the position taken in my concurring opinion in *Chalfin v. Specter,* 426 Pa. 464, 477, 233 A. 2d 562, 568 (1967), joined in by Mr. Justice JONES and Mr. Justice O'BRIEN, that §977 of the 1937 Pennsylvania Election Code, Act of June 3, 1937, P. L. 1333, §977, as amended, 25 P.S. §2937, provides the sole and exclusive remedy for challenging a person's right to run for political office in Pennsylvania. Under that statute, the last day for objecting to John B. Kelly's candidacy on grounds of residence was March 14, 1967.[1] Thus, plaintiff Harrington, just as plaintiff Jaspan before him,[2] comes to court too late.

[1] Section 977 provides that petitions challenging a candidate's right to be nominated for office must be filed "within seven days after the last day for filing said nomination petition or paper." In the present case the last day for filing was March 7, 1967, thus making March 14, 1967 the deadline date for challenges. See *Jaspan v. Osser,* 43 Pa. D. & C. 2d 346, 350 (C.P. 1967).

[2] In *Jaspan v. Osser,* 43 Pa. D. & C. 2d 346 (C.P.) appeal quashed, S. Ct. Pa., East. Dist., Jan. Term, 1967 No. 393, John B. Kelly's right to run in the Democratic primary was challenged on the basis of residence. The lower court held itself to be without jurisdiction since Jaspan did not commence the action timely under §977 of the Election Code. Also believing ourselves to be without jurisdiction for the same reason, we quashed Jaspan's appeal.

Nor does it matter that the present action is brought to block Kelly's actual seating in City Council, rather than to block the appearance of his name on the ballot. The fact remains that the alleged defect underlying Kelly's election to council is the same exact defect which, if timely demonstrated, would have vitiated his right to appear on the primary ballot, or the November general election ballot. Surely the dictates of §977 —that all nomination papers shall be deemed valid if not objected to within the specified time period—would be reduced to naught if the same defect not objected to within the specified time period before the primary could be subsequently used against a man after his election.

Realizing, however, that this Court apparently retreated from the unanimous position taken in *Jaspan v. Osser*, S. Ct. Pa., East. Dist. Jan. Term, 1967 No. 393, when in *Chalfin v. Specter*, 426 Pa. 464, 233 A. 2d 562 (1967) a majority of my Brethren chose to face Arlen Specter's candidacy qualifications on their merits despite the fact that the §977 date had long since passed, I am not surprised that in the present case the majority has again chosen, erroneously in my view, to reach the merits of Kelly's qualifications for office. Thus do I feel compelled to note my disagreement with the manner in which these merits have been "resolved." By holding, as the majority has done, that only City Council can rule on the right of John B. Kelly to hold office, in spite of the fact that he has utterly disregarded the crystal clear residence requirements set forth in the Philadelphia Home Rule Charter, far from preserving this charter as Philadelphia's "Magna Charta," today's decision reduces it to meaningless words alone.

The majority relies primarily upon *Auchenbach v. Seibert*, 120 Pa. 159, 13 Atl. 558 (1888), for its conclusion that this Court has no jurisdiction to pass up-

on Kelly's qualifications for office. Admittedly, on facts materially identical to the present case, this Court in *Auchenbach* did refuse to pass upon the qualifications of a recently elected councilman of the City of Reading. However, *Auchenbach* must be read as an expression of the rule approved sixteen years before in *Commonwealth v. Allen,* 70 Pa. 465 (1872), a rule with whose logic I have considerable difficulty, and would thus urge this Court to re-examine.

In *Allen,* the Court was faced with an attack upon a man's right to sit as a member of Philadelphia's City Council when this man, at the same time, and in violation of statute, was acting as surety for the city treasurer's performance bond. As in the present case, the Court was urged to refrain from deciding the merits of this controversy on the sole ground that city council was charged with the duty of passing upon its own members' qualifications. Nevertheless, the merits *were* reached on the theory that having *commenced* his duties as councilman, defendant's violation of law became grounds for declaring his office *forfeited.* Thus, while admitting that, prior to being seated, council alone had the power to determine the councilman's qualifications, once the defendant officially took office his lack of proper qualifications magically became a ground for forfeiture, over which the court did have jurisdiction. The Court frankly admitted that the very same defect could form the basis for either a disqualification or a forfeiture, the label seemingly dependent solely upon when the action to oust the councilman actually commenced. "The fact that a man is surety for a corporation officer is a cause of disqualification to take the seat, but when the seat is taken it becomes a cause of forfeiture." 70 Pa. at 473.

Thus, under the *Allen* rule, both the *Auchenbach* case and the present case can be explained on the basis that they each involved an action commenced prior to

the actual seating of the councilman being attacked. Indeed, the majority, by its citation of, and quotations from *Allen* indicates that this temporal distinction between disqualification and forfeiture continues to receive judicial approval. If this be true, I wish to disassociate myself completely from such approval. For I believe the *Allen* rule to be totally devoid of common sense.

The very case presented today illustrates clearly the folly of this illogical distinction. Although the lawsuit was commenced prior to Kelly's being seated by council, there is no doubt that he is currently functioning as a member of Philadelphia's highest legislative body. Therefore, the majority of this Court is simply inviting appellant to commence a second suit, alleging that Kelly has forfeited his office by virtue of his continuing failure to comply with the residence requirements of the Home Rule Charter. Furthermore, unless *Allen* be overruled I see no alternative for this Court except to hear such a complaint on the merits.[3]

---

[3] The language in *Allen* urged as granting council alone the power to pass upon the qualifications of its members differs slightly from the language in the Home Rule Charter. However, this difference does not appear to be legally relevant. In *Allen*, the statutory language, taken from a supplement to the act incorporating the City of Philadelphia, recited that "the Select and Common Council, respectively, shall in like manner, as each branch of the legislature of this Commonwealth, judge and determine upon the qualifications of their members; . . ." Admittedly, the language "sole judge of the qualifications of its members," language which appears in the Home Rule Charter, is absent in *Allen*. However, the *Allen* language dictates that the Philadelphia statute shall operate "in like manner, as each branch of the legislature of this Commonwealth, . . ." Thus, the effect of the statute in *Allen* must be gauged by the effect given Art. 2, §9 of the Pennsylvania Constitution which says that "Each House shall choose its other officers, and shall judge of the election and qualifications of its members." This language has been construed to mean that the state legislature shall be the sole judge of its members' quali-

The obvious import of the *Allen* decision was that this Court was unwilling to give up its rights to review the actions of a municipal body such as City Council. As the Court said at page 473: "The demand of the law cannot be set aside by the non-action or wrong action of a body wholly subordinate to it." I therefore believe that the better rule, a rule consistent with both logic and the rationale of *Allen,* would permit judicial review of council's actions *regardless* of when the lawsuit itself is commenced. I would thus read the Home Rule Charter as giving City Council the power to pass on the qualifications of its own members *so long as this power is not abused.* When, however, council abuses its discretion and chooses to seat a man in direct contravention of the mandatory charter requirements, the judiciary, in my view, has the power to prevent this municipal body of seventeen members (which, of course, can act even upon the vote of nine) from ignoring the absolute dictates of a document approved by the entire City of Philadelphia.

Thus, although I concur in the result reached by the majority, I do so *only* because §977 of the Election Code, in my view, so requires. Indeed, if the majority of the Court agreed with this position, I would have no hesitancy whatsoever in quashing this appeal as we did in *Jaspan* by a unanimous Court. However, since the majority *has* chosen to reach the merits of this controversy, in spite of the fact that I strongly believe these merits improperly before us, I must dissent from their resolution of the issue of Kelly's residence. For I believe that John B. Kelly may not continue to occupy a seat in the council of a city in which he simply does not live.

---

fications, thereby making the *Allen* statute indistinguishable from the Home Rule Charter. See *Altshuler Election,* 66 Pa. D. & C. 476 (C.P. 1948); cf. *In Re Contested Election of McNeill,* 111 Pa. 235, 2 Atl. 341 (1885).

530

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

John B. Kelly, Jr. was elected by the voters of Philadelphia to the City Council of Philadelphia as a Councilman-at-large. Section 2-103 of the Philadelphia Home Rule Charter provides: *"Qualifications of Councilmen.* A councilman shall be a citizen of the United States, shall have been a resident of the City for at least one year prior to his election, and shall be at least twenty-five years of age when elected to office. District councilmen shall be, and during their terms of office shall remain, residents of the districts from which they were elected. The Council shall be the sole judge of the qualifications of its members."

According to the record, which the Majority neglect to even mention, *Kelly admittedly is not,* and at the time of his election was not, a resident of Philadelphia,* but, on the contrary, resided in Wynnewood in Montgomery County.* The Majority admit, "If this be true,* *he may not, under the Charter, be seated as a Councilman-at-large."* Nevertheless, in spite of these admissions, (Kelly and City Council contend, and the Court below held, and) a majority of this Court now hold (1) that the admitted fact that Kelly is not a resident of Philadelphia is entirely irrelevant, and (2) that City Council alone has the sole jurisdiction to determine Kelly's eligibility to a seat in City Council, and (3) that the Courts have no power and no jurisdiction to consider and determine this crucial and very important question.

The Majority make four major mistakes:

(1) The Majority nullify the above quoted §2-103 of the Philadelphia Home Rule Charter by blandly and blindly ignoring all the other mandatory provisions and requirements of this section and relying solely on one sentence in this section.

---

* All of this is admitted in and by the preliminary objections.

(2)   The Majority ignore or nullify the Constitution of Pennsylvania.

(3)   The Majority ignore or nullify recent analogous and controlling decisions of the Supreme Court of Pennsylvania.

(4)   Worst of all, the Majority ignore or nullify (a) the Equal Protection of the Laws clause in the 14th Amendment to the Constitution of the United States and (b) recent analogous and controlling decisions of the Supreme Court of the United States: *Baker v. Carr,* 369 U.S. 186; *Douglas v. California,* 372 U.S. 353, 355; *Gray v. Sanders,* 372 U.S. 368; *Wesberry v. Sanders,* 376 U.S. 1, 7-8; *Reynolds v. Sims,* 377 U.S. 533; *WMCA, Inc. v. Lomenzo,* 377 U.S. 633; *Maryland Committee v. Tawes,* 377 U.S. 656; *Lucas v. Colorado General Assembly,* 377 U.S. 713; *Bond v. Floyd,* 385 U.S. 116.

### I.   The Majority Nullify §2-103 of the Charter

The Philadelphia City Charter, contrary to popular belief, is not the Constitution, nor even a part of the Constitution of Pennsylvania, but is the equivalent of an Act of the Legislature, and indeed is subject to change by the Legislature. *Addison Case,* 385 Pa. 48, 57, 122 A. 2d 272. See also, *Cali v. Philadelphia,* 406 Pa. 290, 177 A. 2d 824.

The Majority bases its emotional but erroneous Opinion and conclusion solely upon the last sentence in §2-103: "The Council shall be the sole judge of the qualifications of its members." It is hornbook law that every Legislative Act and every written instrument must be interpreted and construed in its entirety, and not limited or restricted to one sentence thereof, unless that sentence is the *only* pertinent and relevant part. No matter how much the Majority blandly and blindly ignore the first two basic and rocklike provi-

sions upon which §2-103 is built, the position of the Majority boils down to this: Notwithstanding prior basic and mandatory qualification-requirements for a Philadelphia Councilman, *the City Council can legally and Constitutionally ignore all these mandatory qualification-requirements* which are so clearly enumerated and mandated in §2-103 and can admit as a member of City Council any person who is a resident of New York, or of New Jersey, or of California, or of some European country, and has received the votes of a majority or of some of the Philadelphia voters. The slightest analysis of the language of §2-103 makes it difficult to imagine a more absurd interpretation.

The absurdity of this interpretation and construction by the Majority can be demonstrated even more clearly by an example:

If the Princess of Monaco, with her beauty, charm and royalty, who lived in Philadelphia for many years and whose mother still lives in their family home in Philadelphia, wished to become from her royal palace in Monaco a member of the Philadelphia City Council, the voters of Philadelphia (who in reality hero-worship beauty and royalty) would undoubtedly nominate and elect her,[*] and the young members of City Council undoubtedly would seat such a Queen, even though she was not a resident of Philadelphia for a period of one year before her election, or even a citizen of Pennsylvania, or even of the United States. For this Court to hold that Princess Grace's election and seating by City Council would be both valid and Constitutional, because "the Council shall be the sole judge of the qualifications of its members," and the Supreme Court of Pennsylvania and of the United States would have no jurisdiction to pass upon this issue and no power

---

[*] Or, if a vacancy existed, the Democratic City Committee would undoubtedly nominate her.

to invalidate such an election, would make a mockery of the Philadelphia Charter* and of the Constitution of Pennsylvania and of the Constitution of the United States.

## II. The Constitution of Pennsylvania

Article II, §9, of the Constitution of Pennsylvania provides in pertinent part: ". . . Each House shall choose its other officers, and shall judge of the election and qualifications of its members."

Article VIII, §17, of the Constitution of Pennsylvania pertinently provides: "The trial and determination of contested elections of electors of President and Vice-President, members of the General Assembly, and of all public officers, whether State, judicial, municipal or local, *shall be by the courts of law,*** or by one or more of the law judges thereof; . . . ." Could anything be clearer or more clearly demonstrate that the Courts have the jurisdiction and the power to determine whether a member of the State Legislature or of a Municipal Council was Constitutionally elected? As

---

* The recent unargued case of *Jaspan v. Osser* was not decided by a unanimous Supreme Court of Pennsylvania and *even its advocates admit it was overruled by Chalfin v. Specter,* 426 Pa. 464, 233 A. 2d 562. Furthermore, a provision of the City Charter cannot possibly prevail against the Constitution of the United States or the analogous and controlling decisions of the Supreme Court of the United States or of this Court. Moreover, the concurring Opinions admit, as they must, that the Courts have jurisdiction under the City Charter if Kelly's nomination papers had been challenged within seven days after the last day for filing (§977 of the Election Code of 1937). They do not discuss what happens if no one has discovered or has the necessary knowledge within said seven-day time limit, or who under their theory would have any status or standing to bring the challenge. Of course, this further ignores all Constitutional questions which no Court or City Council can legally or Constitutionally ignore.

** Italics throughout, ours.

534

this Court said in *Cali v. Philadelphia,* 406 Pa., supra (page 306) : "No provision of the Home Rule Charter could violate the Constitution."

In *Lesker Case,* 377 Pa. 411, 105 A. 2d 376, objections were filed to the nomination petition of Lesker on the ground that Article II, §5 of the Constitution of Pennsylvania requires that a candidate for Assemblyman must be an inhabitant of his legislative district and must have resided there for at least a year, and Lesker resided in the Fifteenth Legislative District, instead of the Ninth Legislative District, in and from which he desired to be a candidate. This Court, in an Opinion by Mr. Justice MUSMANNO, decided that it had jurisdiction and in a lengthy and detailed Opinion sustained Lesker's petition.

### III. Recent Decisions of the Supreme Court of Pennsylvania

Recent decisions of the Supreme Court of Pennsylvania, following the precepts of the Supreme Court of the United States, held (1) that the apportionment or districting or redistricting of the Senate and of the House of Representatives of the Commonwealth of Pennsylvania were subject to the Equal Protection of the Laws as ordained in the 14th Amendment to the Constitution of the United States, and (2) that the hereinafter-mentioned provisions of the Constitution of Pennsylvania and State acts which violated the Equal Protection clause were invalid and unconstitutional, and (3) that the Supreme Court had the jurisdiction, the power and the duty (a) to decide whether a State and City districting was valid and Constitutional or whether it violated the Constitution of the United States, and (b) if the Legislature of Pennsylvania failed to validly and Constitutionally district or redistrict, and thereby deprived the voters of the Equal

Protection of the Laws, the Courts could and should reapportion and redistrict the State and/or the City, as the case might be: *Butcher v. Bloom,* 415 Pa. 438, 203 A. 2d 556; *Butcher v. Bloom,* 420 Pa. 305, 216 A. 2d 457. These decisions were made in spite of the fact that Article II, §9, of the Constitution of Pennsylvania provides: "Each House . . . shall judge of the election and qualifications of its members," and in spite of the fact that this Court was compelled to declare that §§16 and 17 of Article II of the Constitution of Pennsylvania were unconstitutional, because they violated the Equal Protection clause in the Federal Constitution.

IV. The Constitution of the United States and Recent Decisions of the Supreme Court of the United States

We come now to the most important and most controlling authorities, namely, recent decisions of the Supreme Court of the United States which re-interpreted the Constitution of the United States and sustained the power of the Courts to determine the eligibility and qualifications and seating of members of the Congress and of State Legislatures and of smaller and local Legislative bodies. This new and controlling interpretation of the Constitution of the United States, and of the jurisdiction and the powers of the Courts in this field, was first enunciated in *Baker v. Carr,* 369 U.S., supra, and *Gray v. Sanders,* 372 U.S., supra, and was followed and expanded in the recent redistricting cases hereinabove cited. In these cases, popularly known as "one man, one vote," a majority of the Supreme Court of the United States, in a new and novel interpretation of the Constitution of the United States, made an abrupt and massive break with many prior decisions of that Court, and with prior constructions of the Constitution of the United States which had held

that the qualifications of persons allegedly elected to membership in Congress were political questions to be determined by the Congress, and not by the Courts. These recent cases held that the basic qualifications of members of Congress and of State Legislatures, and of minor public officials, and of Councils, were no longer political questions to be decided by Congress or by the respective Houses or Councilmanic bodies involved, but were *on the basic issues* matters for the Courts to determine, namely, the basic issue of whether the persons who had been elected by the voters complied with and fulfilled the necessary qualifications required by the Equal Protection of the Laws and by other provisions of the Constitution, and could be seated or excluded for Constitutional reasons. See *Baker v. Carr*, 369 U.S., supra; *Douglas v. California*, 372 U.S., supra; *Gray v. Sanders*, 372 U.S., supra; *Wesberry v. Sanders*, 376 U.S., supra; *Reynolds v. Sims*, 377 U.S., supra; *WMCA, Inc. v. Lomenzo*, 377 U.S., supra; *Maryland Committee v. Tawes*, 377 U.S., supra; *Lucas v. Colorado General Assembly*, 377 U.S., supra; *Bond v. Floyd*, 385 U.S., supra.

The aforesaid analogous and controlling cases mandate the Courts, by virtue of the Equal Protection of the Laws and other pertinent provisions of the Constitution of the United States, to determine the eligibility and the necessary qualifications of an elected person for a seat in Congress and in every Legislative body, and whether these basic and required standards have been Constitutionally met and the challenged person can be seated\* or excluded or removed. In the instant

---

\* It is difficult to draw the line of distinction and demarcation which divides the powers of a Court and the powers of the Legislative body with respect to the qualifications of the members of the Legislative body and their right to a seat therein, because the Supreme Court of the United States has not yet clearly drawn this line of distinction. However, it is clear and obvious that

appeal, every voter in Philadelphia is deprived of his statutory right to be represented by a resident and citizen of Philadelphia who has resided in Philadelphia for at least one year prior to his election, as required by §2-103 of the City Charter, and, as we shall see infra, is thus and thereby deprived of the Equal Protection of the Laws.

If there could be the slightest remotest doubt about the jurisdiction and power of a Court to determine the status and qualifications of a member elected to a State or a local Assembly—and there is not the slightest or remotest doubt—it would be removed by the very recent case of *Bond v. Floyd,* 385 U.S. 116. In that case, Bond, a Negro, was three times elected to the Georgia House of Representatives, and three times excluded by that House from membership therein because of his statements criticizing the policy of the Federal Government in Vietnam. The Georgia Constitution pertinently provided: "Election, returns, etc.; . . .—

there is a line of demarcation and that in certain cases the Courts have jurisdiction and in other cases only the Legislative body has jurisdiction. For example, it is a matter of common knowledge that Adam Clayton Powell was excluded by the House of Representatives from a seat therein after he had been twice elected by the voters in his Congressional District, because of his alleged misappropriation of someone else's (his wife's) money. It is likewise a matter of common knowledge that in prior years William C. Maybury was elected by the voters of Michigan to the Senate of the United States; yet the Senate was permitted to and did exclude him from a seat. William S. Vare was elected by the voters of Pennsylvania to the Senate of the United States; yet the Senate excluded him from a seat. In the Maybury case, he was excluded because he had allegedly spent too much money in his campaign (although today the money he spent would have been a drop in the bucket!) ; and in the Vare case, he was excluded because of alleged election irregularities. These decisions were properly made by the respective Legislative body and not by the Courts, and serve to illustrate the line of distinction and demarcation that presently exists, although not yet clearly drawn.

*Each House shall be the judge of the election . . . and qualifications of its members . . . ."* All parties, including the Supreme Court of the United States, agreed that no question of race was involved, but solely a question of the jurisdiction and the power of the Court to decide whether the Georgia House had the power under and because of its Constitution to exclude Bond from membership therein. Chief Justice WARREN, speaking for a unanimous Court, pertinently said (page 118): "The question presented in this case is whether the Georgia House of Representatives may constitutionally exclude appellant Bond, a duly elected Representative, from membership because of his statements, and statements to which he subscribed, criticizing the policy of the Federal Government in Vietnam and the operation of the Selective Service laws."

The Court unanimously held that it had jurisdiction, and that the Georgia Legislature could not exclude Bond, a duly elected Representative, from membership in the Georgia House of Representatives.

To summarize: The *Bond* and other recent decisions of the Supreme Court of the United States, supra, lay down, expressly or by necessary implication, the principle that every voter in a State, City or District is entitled to be represented by, and only by, those persons who comply with and fulfill all Constitutional and statutory requirements which are mandated for membership in the particular Legislative body in question. To permit a person who does not comply with all such requirements to become a member of the Legislative body in question and to represent the voters, without compliance with all the Constitutional and statutory requirements, is to deprive many voters of the right of representation to which they are statutorily and Constitutionally entitled, and of the Equal Protection of the Laws.

Each and all of the aforesaid decisions of the Supreme Court of the United States and the decisions of the Supreme Court of Pennsylvania, as well as the examples hereinabove given, demonstrate beyond the peradventure of a doubt (1) that the Courts have jurisdiction to determine whether Kelly was Constitutionally elected a member of the Philadelphia City Council when he *admitted* on the record in this case that he was *not* a citizen of Philadelphia* at the time of his election and had not been a citizen of Philadelphia for over a year prior thereto, and (2) that this deprived his opponents of the Equal Protection of the Laws to which every American citizen is entitled.**

For each and all of these reasons, I vigorously dissent.

---

* John B. Kelly comes from a famous Philadelphia family. Even if Kelly is denied a seat in the Philadelphia City Council, that does not make Kelly a Philadelphia pariah or destroy his usefulness to Philadelphia. Even if Kelly is not a Councilman, he can be a leader in many civic, cultural, charitable and governmental affairs which aid the well-being, the welfare and the progress of Philadelphia.

** The decisions of the Supreme Court of Pennsylvania on the power of the Courts to determine the qualifications for membership in a Legislature or a City Council or other similar body were in conflict and confusion. Compare the *Lesker* case, supra, and *Commonwealth v. Bennett*, 233 Pa. 286, 82 Atl. 249, and *Commonwealth v. Allen*, 70 Pa. 465, which support this Opinion, with *Auchenbach v. Seibert*, 120 Pa. 159, 13 Atl. 558, which the Majority and concurring Opinions rely on. It will suffice to say that every case which held that the Courts had no jurisdiction or power to determine the election and the qualifications for membership in a Legislative body have been impliedly overruled or reversed or nullified by all of the aforesaid cited and quoted cases.