375 A.2d 698

**Leonard E. SWEENEY, Vincent S. Mazza and James P. Heffley, Appellants,**

**v.**

**C. Delores TUCKER, Secretary of the Commonwealth, Grace M. Sloan, Treasurer of the Commonwealth, Herbert Fineman, Speaker of the House, K. Leroy Irvis, Majority Leader of the House, Samuel Rappaport, Chairman of the Ethics Committee, and Jean Francis, House Comptroller.**

Supreme Court of Pennsylvania.

Argued March 10, 1977.

Decided July 8, 1977.

494

496

Thomas A. Livingston, Dennis J. Clark, Livingston, Miller, O'Malley & Clark, Pittsburgh, for appellants.

Russell A. Davis, Harrisburg, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

On August 27, 1975, the Pennsylvania House of Representatives met in special session and, by a vote of 176 to 1, expelled Leonard A. Sweeney from membership in the House.[1] The Speaker of the House then declared Swee-

_____

1. Pa.Const. art. II, § 11 provides:
 "Each House shall have power to determine rules of its proceedings and punish its members or other persons for contempt or disorderly behavior in its presence, to enforce obedience to its process, to protect its members against violence or offers of bribes or private solicitation, and, with the concurrence of two-

ney's office vacant and issued a writ calling for a special election on November 4, 1975.[2]

On September 24, 1975, Sweeney and two of his former constituents (appellants) filed a complaint in equity in the Commonwealth Court, alleging that the House's action violated Sweeney's constitutional right to his House seat, his right to payment of salary and his former constituents' right to be represented in the House. Named as defendants were C. Delores Tucker, Secretary of the Commonwealth; Grace M. Sloan, Treasurer of the Commonwealth; Herbert Fineman, Speaker of the House; K. Leroy Irvis, Majority Leader of the House; Samuel Rappaport, Chairman of the House Ethics Committee; and Jean Francis, Comptroller of the House (appellees). Appellants requested injunctive relief ordering Sweeney's reinstatement with back pay and barring the special election called to fill his seat.[3] Appellees filed preliminary objections in the nature of a demurrer, which were argued before the Commonwealth Court on October 29, 1975.[4] On January 14, 1976, the Commonwealth Court sustained appellees' preliminary objections

thirds, to expel a member, but not a second time for the same cause, and shall have all other powers necessary for the Legislature of a free State. A member expelled for corruption shall not thereafter be eligible to either House, and punishment for contempt or disorderly behavior shall not bar an indictment for the same offense."

2. Pa.Const. art. II, § 2 provides in part: "Whenever a vacancy shall occur in either House, the presiding officer thereof shall issue a writ of election to fill such vacancy for the remainder of the term."

3. Appellants also requested a declaratory judgment declaring the proposed special election null and void.

4. On November 10, 1975, six days after a special election was held to fill Sweeney's seat, appellants moved for a preliminary injunction to enjoin the Election Return Board of Allegheny County from certifying that a candidate was elected until the Commonwealth Court ruled on the preliminary objections. On November 12, 1975, a judge of the Commonwealth Court denied appellants' motion.

and dismissed the complaint. *Sweeney v. Tucker,* 22 Pa.Cmwlth. 642, 351 A.2d 308 (1976). We affirm.[5]

I

On November 5, 1974, appellant Sweeney was elected to represent the Seventeenth Legislative District in the Pennsylvania House of Representatives. He took the oath of office and was seated on January 7, 1975. Three days later, he was indicted by a grand jury of the United States District Court for the Western District of Pennsylvania on one count of conspiracy to commit mail fraud and five counts of mail fraud.[6] On July 30, 1975, a jury found Sweeney guilty of three counts of mail fraud. The court imposed concurrent sentences of three years imprisonment on each count and fined Sweeney $3,000.00. On August 5, 1975, Sweeney filed a timely appeal from judgment of sentence in the United States Court of Appeals for the Third Circuit.[7]

On August 18, 1975, the House Ethics Committee notified Sweeney by telegram that it would meet on August 25, 1975 to "discuss [his] future status" as a House member and invited him to attend alone or with counsel. Sweeney's counsel responded in a telegram, demanding compliance with the fifteen day notice provision of House Rule 47.[8]

---

5. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, 17 P.S. § 211.203 (Supp.1977).

6. The charges were that Sweeney, an attorney, represented other persons in a scheme to obtain payments from insurance companies for fictitious injuries sustained in fictitious motor vehicle accidents.

7. The Third Circuit affirmed Sweeney's conviction on March 23, 1976. *United States v. Boscia,* 532 F.2d 748 (3d Cir. 1976) (Mem.).

8. Sweeney was apparently relying on House Rule 47 as it stood during the 1973–74 House session. The text of the 1973–74 version of the Rule was also attached as an exhibit to the complaint filed in the Commonwealth Court. On February 19, 1975, however, the House amended Rule 47. The amended version of the Rule was in effect when the House Ethics Committee contacted

The House Ethics Committee met on August 25, 1975 with neither Sweeney nor his counsel in attendance. The Committee concluded that its jurisdiction was limited to violations of the Legislative Code of Ethics and made no recommendation to the House concerning Sweeney's status.[9]

Sweeney on August 18, 1975. The two versions of the Rule are reproduced in Appendices A and B.

Under paragraph six of the Rule as amended, the Committee may initiate a "preliminary investigation" of violations by House members. Only if a majority of the Committee decides that a violation "may have occurred" is the member in question notified. After notification, the member has fifteen days to file a written answer. After receipt of the answer, the Committee must either dismiss the charges within ten days or proceed with a formal investigation not less than ten or more than thirty days after notice to the member.

The telegram sent to Sweeney on August 18, 1975 may have been no more than an invitation to participate in the Committee's "preliminary investigation." 'Under the Rule as amended, Sweeney was not entitled to notice since, at that stage, the Rule permits the Committee to act ex parte.

It is argued that the telegram constituted insufficient notice to Sweeney that a violation may have occurred," in which case Sweeney was entitled to fifteen days to file a written answer. Even if the Committee failed to give Sweeney fifteen days notice, it does not aid Sweeney's cause. The Committee concluded it had no jurisdiction and made no recommendation to the House. Thus, any violation of Rule 47 by the Committee was not related to the House expulsion action. See notes 9–10 infra.

9. In their complaint, appellants alleged:
"A report of [the House Ethics] Committee was given to the House two days after its committee hearing in violation of paragraph 5 [of House Rule 47] which says the committee may not act or report to the House until seven days after the investigated member receives the committee's findings by registered mail."

Both versions of Rule 47 contain the seven day notice provision referred to in the complaint. See Appendices A and B. However, the journal of the proceedings in the House of Representatives, which was attached as an exhibit to the complaint, demonstrates that the House Ethics Committee concluded it had no jurisdiction over Sweeney's case and made no recommendation to the House. See note 10, infra. Since Sweeney's expulsion was not preceded by a recommendation from the Ethics Committee, Rule 47 has no applicability to this case. The alleged noncompliance with Rule 47 cannot support a claim that the House acted illegally in expelling Sweeney.

On August 27, 1975, the House met in special session to consider the following resolution:

"WHEREAS, Representative Leonard E. Sweeney was convicted by the court and a jury in the United States District Court for the Western District of Pennsylvania for violation of Title 18, United States Code, Section 1341; and

"WHEREAS, Sentence pursuant to a finding of guilty was imposed by the court on July 30, 1975; and

"WHEREAS, Pursuant to Article II, Section 9 of the Constitution of the Commonwealth of Pennsylvania the House of Representatives has the exclusive power and authority to judge the qualifications of its members; therefore be it

"RESOLVED, That pursuant to the powers granted to the House of Representatives under Article II, Section 9 and Section 11 of the Constitution of the Commonwealth of Pennsylvania, the House of Representatives does hereby expel Leonard E. Sweeney as a member of the House of Representatives of Pennsylvania."

Again, neither Sweeney nor his counsel appeared. Upon the request of Representative Rappaport, Chairman of the House Ethics Committee,[10] the House inserted in the

10. Representative Rappaport stated:
"It would be facetious at this point to deny that the Ethics Committee had a meeting this past Monday to discuss the matter of Leonard Sweeney.

"I can say to the House that our jurisdiction in that type of meeting is limited to violations of the Legislative Code of Ethics or House rules.

"Since Mr. Sweeney has not been accused by anyone of violating any specific rules of the House or the Code of Ethics, the Ethics Committee has made no recommendation as to the disposition of the so-called Sweeney case.

"However, certain documents that are matters of public record came to our attention. Knowing that the House would be debating resolutions of this nature today, these documents are presented to the House.

"I ask that they be made part of the House record. Copies have been distributed to each member. They consist of the indictment, the judgment of conviction and the notes of testimony of the sentencing."

record copies of Sweeney's indictment, judgment of conviction and notes of testimony of his sentencing. After debate, the House adopted the Resolution expelling Sweeney.

## II—Mootness

■ At the time of oral argument before this Court, Sweeney's term of office had already expired.[11] Therefore, appellants' prayer for an injunction ordering Sweeney's reinstatement as a member of the House of Representatives is moot. See *Meyer v. Strouse*, 422 Pa. 136, 221 A.2d 191 (1966); *Commonwealth ex rel. McCormick v. Swaney*, 313 Pa. 565, 169 A. 883 (1934) (per curiam); *Commonwealth ex rel. v. Floyd*, 274 Pa. 172, 117 A. 778 (1922) (per curiam). In the absence of special circumstances, this Court will not consider such questions. *Meyer v. Strouse*, supra. See generally *Colonial Gardens Nursing Home, Inc. v. Bachman*, 473 Pa. 56, 373 A.2d 748 (filed June 3, 1977); *Commonwealth for and on Behalf of its Citizens and Residents v. Duquesne Light Co.*, 469 Pa. 415, 366 A.2d 242 (1976); *Wiest v. Mt. Lebanon School District*, 457 Pa. 166, 320 A.2d 362 (1974); *Excellent Laundry Co. v. Szekeres*, 382 Pa. 23, 114 A.2d 176 (1955). Similarly, appellants' requests that the special election of November 4, 1975 be enjoined and declared null and void are moot. Appellants' action against appellees Tucker, Fineman, Irvis and Rappaport is based solely on the claims which are now moot. Therefore, we affirm the Commonwealth Court's order dismissing the complaint as to appellees Tucker, Fineman, Irvis and Rappaport.[12]

11. See Pa.Const. art. II, § 3: "Senators shall be elected for the term of four years and Representatives for the term of two years."

12. In *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed. 2d 491 (1969), petitioners requested an injunction restraining (1) respondents from executing the United States House of Repre-

It does not follow, however, that the entire case is moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969), citing E. Borchard, Declaratory Judgments 35–37 (2d ed. 1941). Even though some issues in a case have become moot, a court will consider the remaining "live" issues. *Powell v. McCormack,* supra; *Keystone Building Corp. v. Lincoln Savings and Loan Association,* 439 Pa. 444, 266 A.2d 648 (1970). Since Sweeney has a continuing interest in back pay for the period he was deprived of office, we conclude that the controversy remains a live one. *Powell v. McCormack,* supra; *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). Sweeney's back pay claim against House Comptroller Francis is not moot.[13]

### III

House Comptroller Francis asserts that the Speech or Debate Clause of the Pennsylvania Constitution, Pa.

sentatives resolution excluding Adam Clayton Powell from the House; (2) the Speaker of the House from refusing to administer the oath of office to Powell; (3) the Clerk of the House from refusing to perform the duties due a Representative; (4) the Sergeant at Arms from refusing to pay Powell his salary; and (5) the Doorkeeper from refusing to admit Powell to the House Chamber. 395 U.S. at 494, 89 S.Ct. at 1949. The Supreme Court ruled that Powell's back pay claim was "viable." The Court found it unnecessary to determine whether other issues in the case had become moot because the disposition of the back pay claim resulted in a remand to the trial court where the mootness of the other claims could be considered. 395 U.S. at 496 & n.8, 89 S.Ct. at 1951 & n.8. Here, we have determined that Sweeney's back pay claim is viable but without merit. Part IV, infra. Thus, there will be no remand and proper resolution of this case requires that we rule on the mootness of the remaining issues.

13. Having ruled that the back pay claim is the sole remaining issue in the case, we also affirm the Commonwealth Court order sustaining preliminary objections as to Sweeney's constituents, who have no legally cognizable interest in Sweeney's back pay.

The complaint also alleges that Sweeney's right to the payment of his salary was violated by Secretary of the Treasury Sloan. Appellants conceded before the Commonwealth Court, however, that the complaint did not state a cause of action against Sloan. 22 Pa.Cmwlth. at 646, 351 A.2d at 309.

Const. art. II, § 15, is an absolute bar to this suit. In the alternative, the House Comptroller contends that this action is not justiciable because the Pennsylvania Constitution commits the power to expel a member exclusively to the House of Representatives. We disagree with both contentions and find it necessary to reach the merits of Sweeney's claim that the House deprived him of his rights under the United States Constitution. For convenience, we shall discuss these issues in the above order.

*A. The Speech or Debate Clause*

Pa.Const. art. III, § 15, provides:

"The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach or surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; *and for any speech or debate in either House they shall not be questioned in any other place.*" (emphasis added).

This Court recently observed that the text of the Pennsylvania Speech or Debate Clause is essentially the same as its counterpart in the federal Constitution, U.S.Const. art. I, § 6. *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977). Accordingly, in order to determine whether Sweeney's action against the House Comptroller is barred by Pa. Const. art. II, § 15, we seek guidance from the federal cases which clarify the policies underlying the federal Speech or Debate Clause.[14]

Although the Speech or Debate Clause of the United States Constitution has its roots in English history,[15] "it

---

14. In interpreting Pa.Const. art. II, § 15, we are not bound by cases interpreting U.S.Const. art. I, § 6.

15. For a discussion of the origins of the Speech or Debate Clause, see *United States v. Brewster,* 408 U.S. 501, 544–49, 92 S.Ct. 2531, 2553–55 (1972) (Brennan, J., dissenting, joined by Douglas, J.); *United States v. Johnson,* 383 U.S. 169, 177–84, 86 S.Ct. 749, 754–57, 15 L.Ed.2d 681 (1966).

must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government." *United States v. Brewster,* 408 U.S. 501, 508, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972). The Supreme Court has stated that the Clause is designed to protect "the independence and integrity of the legislature." *United States v. Johnson,* 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966); accord, *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975); *Doe v. McMillan,* 412 U.S. 306, 311, 93 S.Ct. 2018, 2024, 36 L.Ed.2d 912 (1973); *Gravel v. United States,* 408 U.S. 606, 616, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972); *United States v. Brewster,* 408 U.S. at 507–08, 92 S.Ct. at 2535; *Tenney v. Brandhove,* 341 U.S. 367, 373–74, 71 S.Ct. 783, 786–87, 95 L.Ed. 1019 (1951). The legislative immunity created by the Clause "insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation." *Powell v. McCormack,* 395 U.S. at 503, 89 S.Ct. at 1954. The Speech or Debate Clause has been read broadly in order to effectuate its purposes. See *Eastland v. United States Servicemen's Fund,* supra; *Gravel v. United States,* supra (Clause applies to legislative aide for conduct which would be protected legislative act if performed by the legislator himself); *United States v. Johnson,* supra; *Tenney v. Brandhove,* supra; *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1880). But cf. *Doe v. McMillan,* supra (conduct determined to be outside the legislative sphere); *Gravel v. United States,* supra (same); *United States v. Brewster,* supra (same). The Clause "prohibits inquiry into those things generally said or done in the House or Senate in the performance of official duties and into the motivation for those acts." *United States v. Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537; accord, *Eastland v. United States Servicemen's Fund,* 421 U.S. at 501, 95 S.Ct. at

1820; *Doe v. McMillan*, 412 U.S. at 311, 93 S.Ct. at 2024; *Gravel v. United States*, 408 U.S. at 624, 92 S.Ct. at 2626; *Powell v. McCormack*, 395 U.S. at 502, 89 S.Ct. at 1954; *United States v. Johnson*, 383 U.S. at 179, 86 S.Ct. at 755; *Kilbourn v. Thompson*, 103 U.S. at 204.

In evaluating the House Comptroller's assertion that the Speech or Debate Clause of the Pennsylvania Constitution is an absolute bar to this suit, we bear in mind the principle that the "[l]egislative immunity [created by the Speech or Debate Clause] does not . . . bar all judicial review of legislative acts." *Powell v. McCormack*, 395 U.S. at 503, 89 S.Ct. at 1954, citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Even where an action against a legislator is barred by the Speech or Debate Clause, legislative employees who participate in unconstitutional activity are responsible for their actions; that the legislative employees are acting pursuant to express orders of the legislature does not bar judicial review of the underlying legislative decision. *Powell v. McCormack,* supra; see *Kilbourn v. Thompson,* supra. As the Supreme Court stated in *Powell:*

> "The purpose of the protection afforded legislators is not to forestall judicial review of the legislative action but to insure that legislators are not distracted or hindered in the performance of their legislative tasks by being called into court to defend their actions."

395 U.S. at 505, 89 S.Ct. at 1955.

In *Powell,* the petitioners asserted that the resolution passed by the United States House of Representatives excluding Adam Clayton Powell from the House was unconstitutional. The Supreme Court held that the action against those House employees carrying out the resolution which excluded Powell from the House was not barred by the Speech or Debate Clause.[16] Here, as in

16. In *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L. Ed.2d 583 (1972), the Court held that the Speech or Debate

*Powell,* Sweeney claims that the House acted unconstitutionally in denying him his seat.[17] He has sued the House Comptroller to press his claim for back pay. We find the Court's reasoning in *Powell* persuasive and therefore hold that Sweeney's action against the House Comptroller is not barred by the Pennsylvania Speech or Debate Clause.

## B. The Political Question Doctrine

We also reject House Comptroller Francis' contention that the House's expulsion of a member pursuant to Pa. Const. art. II, § 11 is a matter which has been exclusively committed to the House by the Pennsylvania Constitution and is not subject to judicial review.

A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193 (1971) (plurality opinion) ;[18] *Stander v. Kelley,* 443 Pa.

Clause prohibits inquiry into actions of a legislative aide which would be protected by the Speech or Debate Clause if performed by the legislator himself. A legislator is protected against inquiry into conduct which "is within the 'sphere of legitimate legislative activity.' " 408 U.S. at 624, 92 S.Ct. at 2626–27, *quoting Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L. Ed. 1019 (1951). In *Gravel,* the Court reaffirmed its holdings in *Powell v. McCormack,* supra, when it stated:
> "[N]o prior case has held that Members of Congress would be immune if they executed an invalid resolution themselves . . . . Neither they nor their aides should be immune from liability in such circumstances." 408 U.S. at 621, 92 S.Ct. at 2625.

17. In *Powell,* the House excluded Powell from taking the seat to which he had been elected. Here, Sweeney had previously taken his seat and was expelled from the House by resolution. This difference is immaterial for purposes of the Speech or Debate Clause.

18. In *Carroll,* Chief Justice Bell filed an opinion announcing the judgment of the Court, joined by Mr. Justice O'Brien and Mr. Justice Pomeroy. Mr. Justice Pomeroy also filed a concurring opinion. Justice (later Chief Justice) Jones filed a concurring opinion in which Mr. Justice (now Chief Justice) Eagen joined. This writer filed a concurring and dissenting opinion. Justice

406, 250 A.2d 474 (1969) (plurality opinion). The dividing lines among the three branches "are sometimes indistinct and are probably incapable of any precise definition." *Stander v. Kelley*, 433 Pa. at 421–22, 250 A.2d at 482 (plurality opinion). Under the principle of separation of the powers of government, however, no branch should exercise the functions exclusively committed to another branch. See *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937); *Bailey v. Waters*, 308 Pa. 309, 162 A. 819 (1932). See generally *Stander v. Kelley*, supra; *Townships of Springdale & Wilkins v. Mowod*, 23 Pa.Cmwlth. 298, 352 A.2d 194 (1976), rev'd on other grounds, —— Pa. ——, 376 A.2d 983 (filed June 3, 1977); *Jones v. Packel*, 20 Pa.Cmwlth. 606, 342 A.2d 434 (1975).

■ Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers. See e. g., *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). There may be certain powers which our Constitution confers upon the legislative branch, however, which are not subject to judicial review. A challenge to the Legislature's exercise of a power which the Constitution commits exclusively to the Legislature presents a nonjusticiable "political question."[19]

Cohen took no part in the decision of the case. All the participating Justices agreed, however, that as a co-equal and independent branch, the judiciary possessed the power to protect itself against impairment of its functions by compelling the payment of those sums of money reasonably necessary for carrying out its responsibilities.

19. In *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed. 2d 663 (1962), the Supreme Court stated: "The nonjusticiability of a political question is primarily a function of the separation of powers." Some commentators have disputed this theoretical underpinning of the political question doctrine. E. g., Jackson, The Political Question Doctrine, 44 U.Colo.L.Rev. 477, 508–10 (1973); Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517, 538–39 & n.73 (1966).

There has been considerable scholarly debate over the meaning and scope of the political question doctrine under the United States Constitution. E. g., Bickel, The Supreme Court—Foreward: The Passive Virtues, 75 Harv.L.Rev. 40 (1961); Henkin, Is There a "Political Question" Doctrine?, 85 Yale L.J. 597 (1976); Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517 (1966); Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1 (1959). Professor Wechsler described the heart of the political question doctrine when he wrote that a political question exists when "the Constitution has committed to another agency of government the autonomous determination of the issue raised." Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 7–8 (1959).

A political question stands in contrast to the ordinary respect which courts pay to the other branches of government. A political question is not involved when a court concludes that another branch acted within the power conferred upon it by the Constitution:

> "In such cases . . . the court does not refuse judicial review; it exercises it. It is not dismissing an issue as nonjusticiable; it adjudicates. It is not refusing to pass upon the power of the political branches; it passes upon it, only to affirm that they had the power which had been challenged and that nothing in the Constitution prohibited the particular exercise of it."

Henkin, Is There a "Political Question" Doctrine?, 85 Yale L.J. 597, 606 (1976).

In cases involving political questions, however, the courts will not review the actions of another branch because the determination whether the action taken is within the power granted by the Constitution has been "entrusted exclusively and finally to the political branches of government for 'self-monitoring.' " Id. at 599 (footnote omitted).

As the Supreme Court stated in *Baker v. Carr,* 369 U. S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), the determination whether a matter has been exclusively committed by the United States Constitution to another branch of government "is itself a delicate exercise in constitutional interpretation and is a responsibility of this Court as ultimate interpreter of the Constitution." Accord, *Powell v. McCormack,* 395 U.S. 486, 519–21, 89 S.Ct. 1944, 1963–64, 23 L.Ed.2d 491 (1969). The same responsibility lies with this Court as the ultimate interpreter of the Pennsylvania Constitution. We must therefore decide whether the procedures followed by the House of Representatives in exercising its power to expel a member is subject to review by the Pennsylvania courts for an alleged denial of procedural due process or whether the Pennsylvania Constitution commits the expulsion power exclusively to the House of Representatives for self-monitoring.

In *Baker v. Carr,* supra, the Court articulated standards for evaluating whether a case involves a political question:

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217, 82 S.Ct. at 710.[20]

---

**20.** One commentator observes that this passage attempts to synthesize the different conceptions of the political question doc-

The Supreme Court applied these standards in *Powell v. McCormack*, supra. In *Powell*, the petitioners asserted that the resolution of the United States House of Representatives excluding Adam Clayton Powell from his House seat was unconstitutional because it exceeded the power granted the House by U.S.Const. art. I, § 5 to judge the qualifications of its members.[21] Petitioners argued that under art. I, § 5, the House could judge only those qualifications set forth in the Constitution. The Supreme Court applied the standards outlined in *Baker v. Carr* and concluded that petitioners' claim did not present a political question. The Court held that under art. I, § 5, the House could exclude only those persons whose age, citizenship and residency failed to meet the standards prescribed in the Constitution. Since Powell met all three qualifications, the Court ruled that the House acted illegally in excluding him. The majority expressed no opinion whether any limitations exist on Congress' power to expel or punish a member once seated. 395 U.S. at 507 n.27, 89 S.Ct. at 1956 n.27.

In concluding that the House has no power to exclude a member-elect who meets the Constitution's requirements for membership, the Court relied extensively on English and colonial precedents and debates of the Constitutional Convention. The Court also stated:

> "Had the intent of the Framers emerged from these materials with less clarity, we would nevertheless have been compelled to resolve any ambiguity in favor of a narrow constuction [sic] of the scope of Congress' power to exclude members-elect. A fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they

trine. The Supreme Court, 1968 Term, 83 Harv.L.Rev. 59, 65 (1969). For a critical view of the *Baker* standards, see Jackson, The Political Question Doctrine, 44 U.Colo.L.Rev. 477 (1973).

21. U.S.Const. art. I, § 5 provides: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . .."

please to govern them.' 2 Elliot's Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself. . . . [A broad construction of the exclusion power] would . . . ignore Madison's warnings . . . against 'vesting an improper & dangerous power in the Legislature.' 2 Farrand 249."

395 U.S. at 547–48, 89 S.Ct. at 1977–78. Expulsion of a seated member differs greatly from the determination whether a member-elect meets the minimum qualifications for office set forth in the Constitution. In expelling a member, the Legislature seeks to punish the member for misconduct and to protect the integrity of the legislative process. Justice Douglas, in his concurrence in *Powell*, wrote:

"Expulsion for 'misconduct' may well raise different questions, different considerations. Policing the conduct of members . . . is quite different from the initial decision whether an elected official should be seated."

395 U.S. at 553, 89 S.Ct. at 1981.[22] We agree with Justice Douglas that legislative exclusion and expulsion pose different problems in determining the propriety of judicial review.[23]

---

**22.** Justice Douglas also opined: "[I]f this were an expulsion case I would think that no justiciable controversy would be presented."

**23.** We do not believe the Pennsylvania authorities cited by the parties involving legislative exclusion are helpful in resolving the constitutional question before us today. See *Harrington v. Carroll*, 428 Pa. 510, 239 A.2d 437 (1968); *Chase Appeal*, 389 Pa. 538, 133 A.2d 824 (1957); *Auchenbach v. Seibert*, 120 Pa. 159, 13 A. 558 (1888); *In re Contested Election of McNeill*, 111 Pa. 235, 2 A. 341 (1885); *Commonwealth v. Allen*, 70 Pa. 465 (1872); *Commonwealth ex rel. McCurdy v. Leech*, 44 Pa. 332 (1863). An examination of the cases reveals that they do not squarely raise the question of judicial review of legislative action. Moreover, none of the cases addresses the issue of the propriety of judicial review of legislative action which allegedly exceeds the powers granted by

■ The question whether the present case involves a political question is a close one. Article II, section 11 of

the Constitution or statute, or violates an individual's constitutional rights.

In *McNeill*, this Court upheld the constitutionality of a statute providing for trial of contested elections for House and Senate seats in the courts of common pleas. Article VIII, § 17 of the 1874 Constitution provided that contested elections of members of the Legislature

"Shall be by the courts of law, or by one or more of the law judges thereof; the General Assembly shall, by general law, designate the courts and judges by whom the several classes of election contests shall be tried . . .."

Article II, § 9 of the 1874 Constitution provided: "Each house . . . shall be the judge of the election and qualifications of its members." In upholding the constitutionality of the statute passed pursuant to article VIII, § 17, this Court reasoned:

"A careful reading of this sec. 17 shows that its purpose is not to take from each house the power to judge of the election and qualifications of its members, given by sec. 9 cited. Its purpose is merely to provide a method for procuring and presenting to the respective house the evidence and information necessary for an intelligent decision, and to secure early action.

. . . . . . . . . .

"Every fact and every conclusion of law found by the court . . . may be disregarded by the house, and *its decision expressed by its vote as to which is entitled to office is final and conclusive.*"

111 Pa. at 240–42, 2 A. at 342 (emphasis added); accord, *Chase Appeal*, supra (dictum).

The emphasized portion of the passage quoted above from *McNeill*, is dictum which might suggest that the constitutional scheme does not include judicial review of the Legislature's resolution of election contests. See generally *Powell v. McCormack*, 395 U.S. 486, 521 n.42, 89 S.Ct. 1944, 1963 n.42, 23 L.Ed.2d 491 (1969); Annot. 107 A.L.R. 205 (1937). The only issue before the Court in *McNeill*, however, was whether it had jurisdiction before the Legislature resolved the election contest. Even if the dictum was meant to preclude judicial review of the Legislature's decision in election contests, *McNeill* still leaves several unanswered questions. Nothing in the opinion states, for example, whether in judging the qualifications of its members, the Legislature can add qualifications to those enumerated in the Constitution, see Pa. Const. art. II, § 5, or rules out judicial review of legislative exclusion based on such extra-constitutional grounds. See generally *Powell v. McCormack,* supra. Nor is there any indication whether this Court may review legislative exclusion penalizing the exercise of federal constitutional rights. See *Harrington v. Caroll,* supra (Opinion of Musmanno, J.); id. (Opinion of Jones, J. (later C. J.)). See generally *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). We cannot conclude from the ambiguous language in a case which neither addressed these particular issues

the Pennsylvania Constitution grants each House of the Legislature the "power to determine the rules of its proceedings." Specific limitations on the Legislature's power to determine its internal operating procedures are im-

nor involved reviewability on any ground after the Legislature has acted, that the Court meant to preclude judicial review in all these situations.

The other Pennsylvania cases cited above involved the relationship of the courts to legislative bodies of local government units. In those cases, this Court was not engaging in constitutional adjudication or considering the relationship between co-equal branches of government. Rather, the Court was interpreting a statute or home rule charter. Moreover, the constitutionality of the legislative action was not at issue.

In *McCurdy,* in interpreting the Philadelphia Charter Act of 1854, this Court held that it had no jurisdiction to consider an election contest in a quo warranto action to oust an individual whom the city council had adjudged the election winner. However, the reviewability of the council's action was not at issue in the case because the relator had not presented his claim to the city council before requesting the writ of quo warranto. Again, the case does not address the reviewability of council action alleged to be unconstitutional.

In *Auchenbach,* this Court reversed a trial court ruling that it had jurisdiction to void an election of a candidate who did not satisfy a statutory residency requirement for election to the Reading select council. The Court reasoned that the trial court's statutory jurisdiction extended only to election contests and that the power to judge qualifications resided solely with the municipal council. *Harrington* involved identical facts under the Philadelphia Home Rule Charter. In both *Auchenbach* and *Harrington,* the municipal council had not yet passed on the qualifications of the person elected. The issue whether the councils' rulings on qualifications were subject to judicial review was not before the Court. The cases establish only that under the relevant statute or home rule charter, the council must act before an elected official may be disqualified for failure to meet statutory or charter qualifications. They do not establish that the councils' action may not be reviewed by the Court.

Even if *Auchenbach* and *Harrington* are read to preclude judicial review, a questionable conclusion, see *Harrington v. Carroll,* 428 Pa. 510, 526–29, 239 A.2d 437, 445–46 (1968) (concurring and dissenting opinion of Roberts, J.); *Commonwealth v. Allen,* 70 Pa. 465 (1872), they establish no more than the principle that the decision whether to exclude for failure to meet qualifications for office which have been set out by statute or charter is a determination solely for the legislative body of the local government unit. Neither case precludes review of a claim that the council exceeded its power to judge qualifications, see *Powell v. McCormack,* supra, or violated an individual's constitutional rights, see *Bond v. Floyd,* supra.

posed elsewhere in the Constitution. See Pa.Const. art. III, §§ 1–13.[24] These limitations are judicially en-

**24.**

"Article III
LEGISLATION
A. Procedure

§ 1. Passage of bills

No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

§ 2. Reference to committee; printing

No bill shall be considered unless referred to a committee, printed for the use of the members and returned therefrom.

§ 3. Form of bills

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

§ 4. Consideration of bills

Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five per cent of the members elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

§ 5. Concurring in amendments; conference committee reports

No amendment to bills by one House shall be concurred in by the other, except by the vote of a majority of the members elected thereto, taken by yeas and nays, and the names of those voting for and against recorded upon the journal thereof; and reports of committees of conference shall be adopted in either House only by the vote of a majority of the members elected thereto, taken by yeas and nays, and the names of those voting recorded upon the journals.

§ 6. Revival and amendment of laws

No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be reenacted and published at length.

§ 7. Notice of local and special bills

No local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or the thing to be effected may be situated, which notice shall be at least thirty days prior to the introduction into the General Assembly of such bill and in the manner to be provided by law; the evidence of such notice having been published, shall be exhibited in the General Assembly, before such act shall be passed.

forceable. See e. g., *Scudder v. Smith*, 331 Pa. 165, 200 A. 601 (1938) (declaring joint resolution purporting to create a commission unconstitutional as violative of Pa.Const. art. III, § 1 (1874)); *Stewart v. Hadley*, 327 Pa. 66, 193 A. 41 (1937) (declaring act unconstitutional due to Legislature's failure to comply with Pa.Const. art. III, § 3 (1874)).

■ In light of the express procedural limitations imposed on certain legislative functions, it is not impossible to infer from the absence of such limitations on the expulsion power that the Framers intended to leave those procedures exclusively to the discretion of each House. This inference is supported as well by the two-thirds

§ 8. Signing of bills

The presiding officer of each House shall, in the presence of the House over which he presides, sign all bills and joint resolutions passed by the General Assembly, after their titles have been publicly read immediately before signing; and the fact of signing shall be entered on the journal.

§ 9. Action on concurrent orders and resolutions

Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

§ 10. Revenue bills

All bills for raising revenue shall originate in the House of Representatives, but the Senate may propose amendments as in other bills.

§ 11. Appropriation bills

The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

§ 12. Legislation designated by Governor at special sessions

When the General Assembly shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session.

§ 13. Vote denied members with personal interest

A member who has a personal or private interest in any measure or bill proposed or pending before the General Assembly shall disclose the fact to the House of which he is a member, and shall not vote thereon.

vote requirement for expulsion, which protects an individual legislator's rights. In addition, this Court's review of the internal operating procedures of the Legislature is arguably an undue intrusion in the affairs of a coordinate branch.

Nevertheless, we are persuaded that the procedures employed by the House in expelling a member have not been exclusively committed to that body by the Pennsylvania Constitution and can be reviewed by the courts when it is alleged the House action violated a member's right to procedural due process.

First, the determination of the requirements of procedural due process is undeniably within the judicial power vested in the Pennsylvania judiciary by article V, section 1 of the Constitution. See, e. g., *Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 370 A.2d 685 (1977). Indeed, the institutional competence and expertise of the courts is well developed in the due process field. Moreover, the political question doctrine is disfavored when a claim is made that individual liberties have been infringed. See *Davis v. Ichord,* 143 U.S.App.D.C. 183, 442 F.2d 1207, 1213 (1970); Jackson, The Political Question Doctrine, 44 U.Colo.L. Rev. 477, 495–98 (1973); Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517, 583–84 (1966). Where civil liberties are concerned,

> "[o]ne does not think of [the legislature] as functionally equipped or designed to interpret the Constitution without review, nor under our system, does one wish to leave to [the legislature] the unbridled authority to determine the constitutionality of its own acts."

Jackson, The Political Question Doctrine, 44 U.Colo.L. Rev. 477, 501 (footnote omitted). Thus, where the text of the Constitution does not unambigously commit the procedures used in expulsion exclusively and finally to

the House, we are not inclined to construe the Constitution to bar judicial review of a claimed denial of due process.

Second, in a similar context, this Court has held that legislative procedures are subject to judicial scrutiny. In *Commonwealth ex rel. Carcaci v. Brandamore,* 459 Pa. 48, 327 A.2d 1 (1974), an individual who refused to answer questions at the bar of the House of Representatives and was imprisoned pursuant to a House Resolution holding him in contempt,[25] asserted that the procedures by which the House held him in contempt did not satisfy due process. Mr. Justice Pomeroy, writing for a majority of the Court, stated:

> "Of course, the manner in which a legislative body exercises its inherent power to vindicate its authority and processes must satisfy the requirements of procedural due process."

459 Pa. at 56, 327 A.2d at 5; see *Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 614, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1928) (procedures by which the United States Senate exercises its power to investigate is subject "to the restraints imposed or found in the implications of the Constitution"); *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892) (Congress' power to determine its own rules does not include the power to "ignore constitutional restraints or violate fundamental rights"). See also *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). This Court reviewed the House procedures challenged in *Carcaci* to make sure that they satisfied due process.

The House resolution in *Carcaci* was adopted pursuant to the contempt power which is derived from the same constitutional provision, Pa.Const. art. II, § 11—and, in-

**25.** The Legislature has interpreted its power to punish persons for contempt, Pa.Const. art. II, § 11, to include the power to commit a contemnor to prison. See Act of June 13, 1842, P.L. 491, § 1, 46 P.S. § 61 (1968).

deed, the same sentence within that provision—as the expulsion power. We perceive no textual reason to construe one power as exclusively committed to the House and not the other. Moreover, punishment of a member of the House by expulsion and punishment of a non-member by contempt serve similar functions. In both situations, the legislative body is acting to preserve its authority and to protect the integrity of the legislative process. It would be anomalous to hold that one process is reviewable while the other is not.[26]

Finally, we cannot ignore the crucial role state courts play in enforcing constitutional rights. See generally Aldisert, Judicial Expansion of Federal Jurisdiction: A Federal Judge's Thoughts on Section 1983, Comity and the Federal Caseload, 5 L. & Soc. Order 557 (19—). Indeed, there may be less need and justification for committing an issue exclusively to one branch of state government where state courts can decide an issue by reference to the external standard provided by federal law. We believe that proper consideration of the state judiciary's function in our federalist system of government militates toward a construction of the Pennsylvania Constitution which will minimize the number of federal constitutional issues insulated from state court review by the application of the political question doctrine in Pennsylvania.

In *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed. 2d 235 (1966), the Supreme Court held that it had jurisdiction to determine whether the exclusion of a duly elected member of the Georgia House of Representatives for statements he made criticizing United States policy

---

**26.** The House Comptroller's attempt to distinguish *Carcaci* is unpersuasive. The House Comptroller argues that deprivation of liberty "is a far cry" from loss of a House seat and that "it cannot be said that a [House] member must be accorded the same due process rights accorded to a private citizen, such as Carcaci." This argument confuses the issue of reviewability of House procedures with the merits of Sweeney's claim.

in Vietnam violated his rights under the first and fourteenth amendments of the United States Constitution. The Court ruled that the action of the Georgia House "violated Bond's right of free expression under the First Amendment." 385 U.S. at 137, 87 S.Ct. at 350.

 While *Bond* establishes that a claim that legislative action depriving a legislator of his seat violated the legislator's federal constitutional right may be redressed by the courts,[27] the case involved federal, not state, court jurisdiction. The federal Constitution may not mandate that the Pennsylvania courts provide a forum for such claims if the Pennsylvania Constitution deprives the courts of jurisdiction.[28] We conclude, however, that the

27. In *Bond*, the Court responded as follows to the State's argument that Bond's disqualification was based on a constitutional standard, i. e., the oath requirement of the Georgia Constitution: ". . . Bond's contention is that this standard was utilized to infringe his First Amendment rights, and we cannot distinguish for purposes of jurisdiction, between a disqualification under an unconstitutional standard and a disqualification which, although under a proper standard, is alleged to violate the First Amendment."
385 U.S. at 131, 87 S.Ct. at 347. Under this rationale, we believe that federal courts have jurisdiction over claims that state legislative action expelling a legislator violated his federal constitutional rights. See *Gordon v. Leatherman*, 450 F.2d 562 (5th Cir. 1971); *McCarley v. Sanders*, 309 F.Supp. 8 (M.D.Ala.1970) (three-judge court).

28. The Supremacy Clause of the federal Constitution, U.S.Const. art. VI, "Makes plain that if a state court undertakes to adjudicate a controversy, it must do so in accordance with whatever federal law is applicable." Hart, The Relations Between State and Federal Law, 54 Colum.L.Rev. 489, 507 (1954). Whether a state must adjudicate a controversy simply because a federal right is asserted is not so plain.
The leading Supreme Court cases establish that a state has a constitutional obligation to enforce a federal right if it enforces an analogous state right and may not decline to adjudicate a case on grounds which discriminate against a federal interest. *Missouri v. Mayfield*, 340 U.S. 1, 4–5, 71 S.Ct. 1, 3, 95 L.Ed. 8 (1950); *McKnett v. St. Louis & S. F. Ry.*, 292 U.S. 230, 233–34, 54 S.Ct. 690, 691–92, 78 L.Ed. 1227 (1934); *Douglas v. New York, N. H. & H. R. R.*, 279 U.S. 377, 387–88, 49 S.Ct. 355–56, 73 L.Ed. 747 (1929); *Mondou v. New York, N. H. & H. R. R.*, 223 U.S. 1, 57, 32 S.Ct. 169, 178, 56 L.Ed. 327 (1912); see *Herb v. Pitcairn*, 324 U.S. 117, 120, 65 S.Ct. 459, 460–61, 89 L.Ed. 789 (1945). See generally

Pennsylvania Constitution should be construed, when possible, to permit state court review of legislative action alleged to be unconstitutional.

There is a state interest in resolving a federal claim against state legislative action in the state forum. Generally, it is preferable that conflicts arising from the functioning of state government be resolved without resort to the federal judiciary. State court expertise in state law may enhance the quality of the constitutional adjudication. For example, in the *Bond* litigation, one federal judge asserted that Bond's exclusion was unlawful under the Georgia Constitution. See 251 F.Supp. 333, 351–57 (N.D.Ga.1966) (three-judge court) (dissenting opinion). Moreover, federal court intervention in state affairs may be more intrusive than adjudication

Note, State Enforcement of Federally Created Rights, 73 Harv.L. Rev. 1551 (1960) [hereinafter "State Enforcement"].

In holding that state courts must accept jurisdiction under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. (1972), the Supreme Court stated:

"[T]here is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts . . . but only a question of *the duty of such a court when its jurisdiction, as prescribed by local laws is appropriate to the occasion,* and is invoked in conformity with those laws to take cognizance of an action to enforce a right of civil recovery arising under the act of Congress . . .."

*Mondou v. New York, N. H. & H. R. R.,* 223 U.S. at 56, 32 S.Ct. at 178 (emphasis added).

There is also some authority for the proposition that Congress can require states to enforce federally created rights when no analogous state created rights exist. See *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); State Enforcement, supra at 1554–56. In the absence of a Congressional mandate, the federal Constitution probably does not require the states to adjudicate a federal claim when the state courts' jurisdiction is not "appropriate to the occasion." Our federal system recognizes the importance of "maintaining the states as viable political units with the ability to direct the ends for which their judicial systems shall be used." State Enforcement, supra at 1555.

Thus, the federal Constitution probably would not be offended if the Pennsylvania Constitution precluded all review by the state judiciary of legislative expulsion. See also *Henry v. Mississippi,* 379 U.S. 443, 452–53, 85 S.Ct. 564, 570, 13 L.Ed.2d 408 (1965). But see *State v. Banks,* 454 S.W.2d 498, 501 (Mo.1970).

by the state courts. The federal courts have developed several doctrines of restraint to minimize such federal-state friction. See generally Field, Abstention in Constitutional Cases: The Scope of the *Pullman* Doctrine, 122 U.Pa.L.Rev. 1071 (1974). The state courts have a parallel responsibility to enforce federal constitutional rights. This Court has attempted to meet this responsibility in the administration of criminal justice. In *Commonwealth v. Schmidt,* 452 Pa. 185, 299 A.2d 254 (1973), Mr. Justice Pomeroy stated:

> "By aligning our State's conception of 'waiver' under the [Post Conviction Hearing Act][29] with that used in federal courts, this Court has sought to insure that the occasions would be few when the federal courts . . . would find it necessary to reach and decide issues which our State courts had refused to decide on the merits."

452 Pa. at 195, 299 A.2d at 260 (Opinion of Pomeroy, J., joined by Eagen, J. (now C. J.), with three Justices concurring in the result). The salutary principle expressed by Mr. Justice Pomeroy is no less forceful in the present context. When possible, this Court should construe the Pennsylvania Constitution to permit state adjudication of those federal claims, raised against actions of the political branches of state government, which are cognizable in federal court.

For the reasons discussed above, we hold that the Pennsylvania Constitution does not bar judicial review of a claim that legislative action expelling a member from his seat violated his federal constitutional rights.

### IV—Due Process

In order to determine the requirements of procedural due process, we must first determine if the interest as-

29. Act of January 25, 1966, P.L. (1965) 1580, § 4, 19 P.S. § 1180–4 (Supp.1977).

serted by Sweeney is protected by the due process clause, U.S.Const. amendment XIV.[30] *Pennsylvania Coal Mining Association v. Insurance Department*, 471 Pa. 437, 370 A.2d 685 (1977). "The applicability of the constitutional guarantee of procedural due process depends in the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment." *Arnett v. Kennedy*, 416 U.S. 134, 164, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 15 (1974) (Powell, J., concurring joined by Blackmun, J.) ; accord, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Only if a legitimate property or liberty interest exists does a court determine "what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

■ Sweeney asserts that he has a property interest in his House seat.[31] House Comptroller Francis, relying heavily on several older Supreme Court cases,[32] argues that Sweeney has no property interest within the sense of the constitutional guarantee of due process. Under modern notions of due process, property interests encom-

---

**30.** The complaint filed in the Commonwealth Court also alleged that the House action denied Sweeney due process under the Pennsylvania Constitution. See generally *Pennsylvania Coal Mining Ass'n v. Insurance Dep't*, 471 Pa. 437, 370 A.2d 685 (1977); *Norvell Estate*, 415 Pa. 427, 203 A.2d 538 (1964), cert. denied, 380 U.S. 913, 85 S.Ct. 900, 13 L.Ed.2d 799 (1965). This claim was abandoned in this appeal. State law or the state Constitution, however, may define property interests, which are then entitled to protection under the due process clause of the federal Constitution. See Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489, 509 (1977).

**31.** Sweeney raises no claim that the House action deprived him of a liberty interest. See generally *McCarley v. Sanders*, 309 F. Supp. 8 (M.D.Ala.1970) (three-judge court).

**32.** *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Cave v. Missouri ex rel. Newell*, 246 U.S. 650, 38 S.Ct. 334, 62 L.Ed. 921 (1918); *Taylor v. Beckham*, 178 U.S. 548, 20 S. Ct. 890, 44 L.Ed. 1187 (1900); *Wilson v. North Carolina*, 169 U.S. 586, 18 S.Ct. 435, 42 L.Ed. 865 (1898).

pass those interests to which a person has "a legitimate claim of entitlement." *Board of Regents of State Colleges v. Roth* 408 U.S. at 577, 92 S.Ct. at 2709. Whether an interest is entitled to due process protections depends on the nature of the governmental activity and the citizen's dependency and justifiable reliance on that activity. *Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. at 437, 370 A.2d at 685–86.

It is questionable whether Sweeney's interest in his office is a property interest. Sweeney fails to articulate why his interest in his office should be considered property within the meaning of the fourteenth amendment. It is clear, though, that if he has a property interest, it is a highly circumscribed one. See *Gordon v. Leatherman,* 450 F.2d 562 (5th Cir. 1971). An elected office is a public trust, not the private domain of the officeholder. A member of the Legislature has a profound responsibility to represent his constituents in the formulation of public policy in this state. He holds office for the benefit of his constituents and cannot justifiably rely on a private need or expectation in holding office. He is periodically accountable to his constituents through the electoral process. Due to the paramount public interest in the integrity of the legislative process, the Pennsylvania Constitution provides for expulsion by two-thirds vote of the representatives of the people of the entire state. A member of the Legislature is thus subject to the political process at all times. See generally id. at 565 (an elected official is "subject to the conditions imposed by the terms and nature of the political system in which he operates"). This is properly so for the public interest in the office far outweighs any private interest of the officeholder. An elected official can never have tenure in the same sense as an ordinary public employee.

Even assuming Sweeney's interest is entitled to procedural protections, we are convinced that his rights have

not been violated. "[C]onsideration of what procedures due process may require . . . must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961), quoted in *Morrissey v. Brewer*, 408 U.S. at 481, 92 S.Ct. at 2600 and *Pennsylvania Coal Mining Association v. Insurance Department*, 471 Pa. at 447–448, 370 A.2d at 691. Given the circumscribed nature of a legislator's private interest in his elected office and the overriding need for the Legislature to protect its integrity through the exercise of the expulsion power, it may be that the requirement of a two-thirds vote to expel by itself satisfies procedural due process. Sweeney fails to explain why the process he received was insufficient. His reliance on the alleged violation of House Rule 47 implies a claim that notice was insufficient. Assuming he is entitled to notice, the "timing and content of the notice . . . will depend on the appropriate accommodation of the competing interests involved." *Goss v. Lopez*, 419 U.S. 565, 579, 95 S. Ct. 729, 738–39, 42 L.Ed.2d 725 (1975). Consideration of the competing interests at stake in legislative expulsion convinces us that Sweeney had adequate notice of the impending House action.

Sweeney's challenge to the procedures employed by the House in exercising its constitutional power to expel is without merit.

Decree affirmed. Each party pay own costs.

MANDERINO, J., joins in this opinion and filed a concurring opinion.

## APPENDIX A

### HOUSE RULE 47, 1973–74—HOUSE SESSION VERSION

"The Committee on Ethics shall consist of eight members; four shall be members of the Majority Party appointed by the Speaker and four shall be of the Minority Party appointed by the Minority Leader. The Speaker shall designate the Chairman.

"The Committee shall receive complaints or charges against members, officers and employees of the House and upon the vote of a majority of the members entitled to be on the Committee, may investigate possible unethical conduct of members, officers or employees as to violations of Act No. 154 of 1968 or any violations of the Rules of the House which pertain to legislative ethics or decorum. In the event that the Committee elects to investigate the conduct of any member, officer or employee, such person shall receive at least fifteen days' written notice of the matters under investigation and shall be entitled to present evidence, cross-examine witnesses and be represented by counsel before the Committee. The Chairman may grant a continuance for reasonable cause.

"The Committee shall conduct its investigations and hold its hearings in closed session and the fact that such investigation is being conducted or that hearings are being held or are to be held shall be confidential information unless the person subject to investigation advises the Committee in writing that he elects that any hearings may be held publicly. In the event of such an election, the Committee shall furnish such person a public hearing.

"The Chairman, upon the vote of a majority of the members of the Committee or upon the request of the person subject to investigation, shall issue subpoenas for

the attendance and testimony of witnesses and the production of documentary evidence relating to any matter under investigation by the Committee. The Committee may administer oaths or affirmations, examine and receive evidence.

"All testimony, documents, records, data, statements or information received by the Committee in the course of any investigation shall be private and confidential except in the case of public hearings or in a report to the House. No report shall be made to the House unless the Committee has made a finding of unethical or illegal conduct on the part of the person under investigation. No finding of unethical or illegal conduct shall be valid unless signed by at least a majority of the members entitled to be on the Committee. No action shall be taken on any finding of illegal or unethical conduct nor shall such finding or report containing such a finding be made public sooner than seven days after a copy of the finding is sent by registered mail to the legislator, officer or employee under investigation.

"The Committee may adopt further rules of procedure not inconsistent with this rule.

"The Committee on Ethics may meet with a committee of the Senate to hold investigations or hearings involving employees of the two Houses jointly or officers or employees of the Legislative Reference Bureau, the Joint State Government Commission, the Local Government Commission, the Legislative Budget and Finance Committee and the Legislative Data Processing Committee; provided, however, that no action may be taken at a joint meeting unless it is approved by a majority of the members of the House entitled to be on the House Committee on Ethics.

"The Committee at the request of a legislator, officer or employee concerned about an ethical problem relating

to himself alone or in conjunction with others, may render advisory opinions with regard to questions relating to Act No. 154 of 1968 or the Rules of the House pertaining to legislative ethics or decorum. Such advisory opinions, with such deletions and changes as shall be necessary to protect the identity of the persons involved or seeking them, may be published."

APPENDIX B

HOUSE RULE 47, as amended during
the 1975–76 House Session

"As used in the context of this rule, the word 'Committee' shall mean the Committee on Ethics of the House of Representatives, and the phrase 'majority of the Committee:' shall mean a majority of the members to which the Committee is entitled:

"The Committee shall consist of eight members: four of whom shall be members of the Majority Party appointed by the Speaker, and four of whom shall be members of the Minority Party appointed by the Minority Leader. The Speaker shall appoint from the members a Chairman, Vice Chairman and Secretary for the Committee. The Chairman shall be a member of the majority party and the Vice Chairman shall be a member of the minority party.

"The Chairman shall notify all members of the Committee at least twenty-four hours in advance of the date, time and place of a regular meeting. Whenever the Chairman shall refuse to call a regular meeting, a majority of the Committee may vote to call a meeting by giving two days' written notice to the Speaker of the House setting forth the time and place for such meeting. Such notice shall be read in the House and posted in the House Chamber by the Chief Clerk, or his designee. Thereaf-

ter, the meeting shall be held at the time and place specified in such notice.

"The Committee shall conduct its investigations, hearings and meetings relating to a specific investigation or a specific member, officer or employee of the House in closed session and the fact that such investigation is being conducted or to be conducted or that hearings or such meetings are being held or are to be held shall be confidential information unless the person subject to investigation advises the Committee in writing that he elects that such hearings shall be held publicly. In the event of such an election, the Committee shall furnish such person a public hearing. All other meetings of the Committee shall be open to the public.

"The Committee shall receive complaints against members, officers and employees of the House alleging illegal or unethical conduct. Any such complaint must be in writing verified by the person filing the complaint and must set forth in detail the conduct in question and the section of the 'Legislative Code of Ethics' or House rule violated. The Committee shall make a preliminary investigation of the complaint, and if it is determined by a majority of the Committee that a violation of the rule or law may have occurred, the person against whom the complaint has been brought shall be notified in writing and given a copy of the complaint. Within fifteen days after receipt of the complaint, such person may file a written answer thereto with the Committee. Upon receipt of the answer, by vote of a majority of the Committee, the Committee shall either dismiss the complaint within ten days or proceed with a formal investigation, to include hearings, not less than ten days nor more than thirty days after notice in writing to the persons so charged. Failure of the person charged to file an answer shall not be deemed to be an admission or create an

inference or presumption that the complaint is true, and such failure to file an answer shall not prohibit a majority of the Committee from either proceeding with a formal investigation or dismissing the complaint.

"A majority of the Committee may initiate a preliminary investigation of the suspected violation of a Legislative Code of Ethics or House rule by a member, officer or employee of the House. If it is determined by a majority of the Committee that a violation of a rule or law may have occurred, the person in question shall be notified in writing of the conduct in question and the section of the 'Legislative Code of Ethics' or House rule violated. Within fifteen days, such person may file a written answer thereto. Upon receipt of the answer, by vote of a majority of the Committee, the Committee shall either dismiss the charges within ten days or proceed with a formal investigation, to include hearings, not less than ten days nor more than thirty days after notice in writing to the person so charged. Failure of the person charged to file an answer shall not be deemed to be an admission or create an inference or presumption that the charge is true, and such failure to file an answer shall not prohibit a majority of the Committee from either proceeding with a formal investigation or dismissing the charge.

"In the event that the Committee shall elect to proceed with a formal investigation of the conduct of any member, officer or employee of the House, the Committee shall employ independent counsel who shall not be employed by the House for any other purpose or in any other capacity during such investigation.

"All constitutional rights of any person under investigation shall be preserved, and such person shall be entitled to present evidence, cross-examine witnesses, face his accuser, and be represented by counsel.

"The Chairman may continue any hearing for reasonable cause, and upon the vote of a majority of the Committee or upon the request of the person subject to investigation, the Chairman shall issue subpoenas for the attendance and testimony of witnesses and the production of documentary evidence relating to any matter under formal investigation by the Committee. The Committee may administer oaths or affirmations and examine and receive evidence.

"All testimony, documents, records, data, statements or information received by the Committee in the course of any investigation shall be private and confidential except in the case of public hearings or in a report to the House. No report shall be made to the House unless a majority of the Committee has made a finding of unethical or illegal conduct on the part of the person under investigation. No finding of unethical or illegal conduct shall be valid unless signed by at least a majority of the Committee. Any such report may include a minority report. No action shall be taken on any finding of illegal or unethical conduct nor shall such finding or report containing such finding be made public sooner than seven days after a copy of the finding is sent by certified mail to the member, officer or employee under investigation.

"The Committee may meet with a Committee of the Senate to hold investigations or hearings involving employees of the two houses jointly or officers or employees of the Legislative Reference Bureau, the Joint State Government Commission, Local Government Commission, Legislative Budget and Finance Committee and the Legislative Data Processing Committee; provided, however, that no action may be taken at a joint meeting unless it is approved by a majority of the Committee.

"In the event that a member of the Committee shall be under investigation, such member shall be temporarily

replaced on the Committee in a like manner as said member's original appointment.

"The Committee, whether or not at the request of a member, officer or employee concerned about an ethical problem relating to himself alone or in conjunction with others, may render advisory opinions with regard to questions pertaining to legislative ethics or decorum. Such advisory opinions, with such deletions and changes as shall be necessary to protect the identity of the persons involved or seeking them, may be published and shall be distributed to all the members of the House.

"Any member of the Committee breaching the confidentiality of materials and events as set forth in this rule shall be removed immediately from the Committee and replaced by another member of the House in a like manner as said member's original appointment.

"The Committee may adopt rules of procedure for the orderly conduct of its affairs, investigations, hearings and meetings, which rules are not inconsistent with this rule.

"The Committee shall continue to exist and have authority and power to function after the sine die Adjournment of the General Assembly and shall so continue until the expiration of the then current term of office of the members of the Committee."

MANDERINO, Justice, concurring.

I join in the opinion of the Court. However, I cannot accept the continued reliance, at pages 712 and 713, on the outmoded method of defining the scope of due process protections in terms of a "property interest."

It is sufficient to recognize that Mr. Sweeney's interest is entitled to due process protection without having to analogize it to a right in property.